# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### LUBBOCK DIVISION

| | | |
|---|---|---|
| **BRITTANY WHITE, individually and as surviving sister of JASMAN WASHINGTON, and as the Personal Representative on behalf of the Estate of JASMAN WASHINGTON,** | ) ) ) ) ) | |
| | ) | **CIVIL ACTION NO.: 5:22-cv-71** |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **CITY OF LUBBOCK, LUBBOCK COUNTY SHERIFF'S OFFICE, LUBBOCK COUNTY, TROOPER JOHN RIDLEY, CORPORAL BROCK GRUNER, OFFICER JOHN DOE ONE, OFFICER JOHN DOE TWO, and OFFICER JOHN DOE THREE.** | ) ) ) ) | |
| **Defendants.** | | |

## ORIGINAL COMPLAINT

Plaintiff BRITTANY WHITE ("Plaintiff"), on behalf of herself, and on behalf of the estate of her deceased brother, JASMAN WASHINGTON, by and through their attorneys, brings this action for damages and other legal and equitable relief from Defendants CITY OF LUBBOCK, LUBBOCK COUNTY SHERIFF'S OFFICE, LUBBOCK COUNTY, TROOPER RIDLEY, CORPORAL BROCK GRUNER, JOHN DOE OFFICER ONE, JOHN DOE OFFICER TWO, and JOHN DOE OFFICER THREE. (collectively "Defendants"), for violations of rights under the United States Constitution, including protection against excessive force under the Fourth Amendment in violation of 42 U.S.C.A. § 1983, failures to adopt police or train in violation of U.S.C.A. § 1983 and any other cause(s) of action that can be inferred from the facts set forth herein.

## INTRODUCTION

1.      This is an action brought by Plaintiff individually and on behalf of her deceased brother, Jasman Washington ("Mr. Washington"), against Defendants for the use of excessive and deadly force resulting in the unlawful killing of Mr. Washington by heavy gunfire and under the color of law in violation of individual rights under the Fourth Amendment of the United States Constitution, in violation of civil rights pursuant to 42 U.S.C § 1983, and for wrongful death claims pursuant to the Texas Tort Claims Act.

2.      On or around April 16, 2020, Defendants City of Lubbock, Lubbock County Sheriff's Office, and Lubbock County (collectively "Law Enforcement Entity Defendants"), acting collectively under the banner of an Anti-Gang Taskforce ("AGT"),  did not adopt a joint use-of-force policy leading to the greater likelihood of the deprivation of constitutional rights. Law Enforcement Entity Defendants then failed to properly hire, train, supervise, screen, discipline, transfer, counsel, or otherwise control officers acting in coordination under the AGT.

3.      Law Enforcement Entity Defendants' joint failures to adequately supervise, discipline, and train law enforcement officers acting in coordination under the AGT; to implement the necessary polices; and to implement unconstitutional policies, caused at or around five law enforcement officers, specifically Defendant Ridley, Defendant Gruner, and the John Doe Defendants, to fire approximately twenty bullets at Mr. Washington while Mr. Washington was not a threat in his vehicle; thereby causing Mr. Washington to suffer unwarranted, unlawful, excruciating physical and mental anguish, and, ultimately, his death.

4.      In firing multiple rounds at Mr. Washington, Defendants Ridley and Gruner consciously disregarded the constitutional rights of Mr. Washington knowing that the Law Enforcement Entity Defendants would approve and/or ratify their actions. Subsequently, and as of

this time, the Law Enforcement Entity Defendants have not formally disciplined any of the law enforcement officers involved in the killing of Mr. Washington.

5.      As a result of Defendants' unlawful actions, Plaintiff, individually as the sister of Mr. Washington, and as the personal representative of Mr. Washington's estate, is entitled to recover for damages pursuant to violations of rights under the United States Constitution, including protections against deadly excessive force under the Fourth Amendment under 42 U.S.C.A. § 1983; failures to train, supervise, or discipline, resulting in the deprivation of constitutional rights under 42 U.S.C.A. § 1983; unlawful official policies or absence of polices that caused the law enforcement officers actions likely to lead to deadly excessive force against Plaintiff under 42 U.S.C.A. § 1983; and for wrongful death under TEX. CIV. PRAC. & REM. CODE § 71.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; and (iii) 42 U.S.C.A. § 1983.

7.      The Court's supplemental jurisdiction is invoked by 28 U.S.C. § 1367(a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of operative facts such that they form part of the same case or controversy under Article III of the United States Constitution.

8.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

**PARTIES**

9.     Brittany White ("Ms. White") is and has been, at all relevant times, a citizen of the United States of America and is a resident of the State of Texas. Ms. White is a resident of Lubbock County Texas. Ms. White sues on behalf of herself, as the wrongful death beneficiary of her brother, Mr. Washington, and as the personal representative of the Estate of Mr. Washington.

10.    Lubbock County is a local governing municipality within Texas that funds the Lubbock County Sheriff's Office and is within the Northern District of Texas.

11.    Lubbock County Sheriff's Office is a local law enforcement entity within Lubbock County, Texas that establishes, operates, and supervises all final official policies regarding law enforcement on behalf of Lubbock County law enforcement officers. Lubbock County Sheriff's Office is responsible for the implementation of the office budget, policies, procedures, practices, and customs, as well as the acts and omissions of its law enforcement officers based on the training of each officer. Lubbock County Sheriff's Office is within the Northern District of Texas.

12.    The City of Lubbock is a local governing municipality located in Lubbock County, Texas. The City of Lubbock funds and operates the Lubbock Police Department. Under the Lubbock City Charter, the Lubbock Police Department is delegated with official final policymaking authority to establish, operate and supervise polices, in accordance with Lubbock City Ordinances, towards the suppression of crime and the arrest of individuals within the City of Lubbock.[1] In addition, the Lubbock Police Department is delegated with the authority for the

---

[1] Lubbock, Texas, Code of Ordinances, Art. 2.07 available at
https://z2codes.franklinlegal.net/franklin/Z2Browser2.html?showset=lubbockset

implementation of the office budget, policies, procedures, practices, and customs, as well as the acts and omissions of its law enforcement officers based on the training of each officer.[2] The City of Lubbock is within the Northern District of Texas.

13.    Trooper John Ridley is a law enforcement officer with the Texas Department of Public Safety ("DPS") and is sued in his individual and official capacity. At all relevant times, Ridley was acting under the color of law as a DPS Law Enforcement Officer in coordination with other Law Enforcement Entity Defendants' officers under the AGT.

14.    Corporal Brock Gruner is a law enforcement officer with the City of Lubbock and is sued in his individual and official individual capacity. At all relevant times, Ridley was acting under the color of law as a Lubbock Police Department Officer in coordination with other Law Enforcement Entity Defendants' officers under the AGT.

15.    Officer John Doe One is a law enforcement officer and is sued in his individual and official capacity. At all relevant times, Officer John Doe One was acting under the color of law as a Law Enforcement Officer in coordination with the Law Enforcement Entity Defendants' officers under the AGT.

16.    Officer John Doe Two is a law enforcement officer and is sued in his individual and official capacity. At all relevant times, Officer John Doe Two was acting under the color of law as a Law Enforcement Officer in coordination with the Law Enforcement Entity Defendants' officers under the AGT.

17.    Officer John Doe Three is a law enforcement officer and is sued in his individual and official capacity. At all relevant times, Officer John Doe Three was acting under the color of

---

[2] *Id.*

law as a Law Enforcement Officer in coordination with the Law Enforcement Entity Defendants'
officers under the AGT.

## **STATEMENT OF FACTS**

### A.  **The Anti-Gang Task Force**

18.     In or around April 2020, the City of Lubbock, Lubbock County Sheriff's Office,
and Lubbock County, collectively ("Law Enforcement Entity Defendants") were operating
together under an Anti-Gang Taskforce ("AGT") for the purposes of addressing gang-related
violence in Lubbock County.

19.     Upon information and belief, the Law Enforcement Entities organized the AGT as
an interagency task force with standards only as to the purpose and actions of the AGT. However,
the Law Enforcement Entity Defendants failed to organize the AGT with any standard operating
procedures, policies, or practices in place.

20.     Instead, the law enforcement officers that comprised the AGT conducted their law
enforcement operations based on their own Law Enforcement Entity's policies, procedures,
customs, tactics, and training.

21.     As a result, upon information and belief, the Law Enforcement Entity Defendants
chose to have their law enforcement officers jointly operate without any coordination on ensuring
the AGT followed appropriate and lawful practices, policies, and procedures.

22.     Upon information and belief, the Law Enforcement Entity Defendants did not
provide their respective law enforcement officials with the appropriate training on maintaining
lawful practices, such as the lawful use of force, when operating as part of an interagency task
force or in coordination with other Law Enforcement Entity officers.

B. **The Initial Operations of the AGT on or around April 16, 2020**

23.    On or around April 16, 2020, several law enforcement officers from the Law Enforcement Entity Defendants were jointly operating under the AGT to conduct an operation in Lubbock, Texas.

24.    Later the same day, on or around 2:00 PM, the AGT was operating in the area of 1700 East Dartmouth Street, Lubbock, TX 79403. While operating in this area, some of the AGT officers noticed a vehicle that resembled a vehicle that had been reported stolen earlier in the day.

25.    AGT officers subsequently unsuccessfully attempted to conduct a stop of the vehicle as the vehicle drove away. AGT officers then engaged in a pursuit of the vehicle throughout the area.

26.    Eventually the vehicle came to a stop at or around the intersection of East 10th Street and Ute Avenue in Lubbock, Texas. Following the stop, AGT officers allegedly reported observing three individuals exit the vehicle and flee on foot.

27.    Shortly afterwards, AGT officers apprehended one of the individuals, Tabrick Johnson, at or around the area of East 10th Street and Walnut Ave. in Lubbock, Texas. AGT Officers arrested Mr. Johnson.

28.    After Mr. Johnson had been taken into custody, AGT officers set up a perimeter within the area to specifically search for an unidentified woman who had fled on foot. AGT officers were aided in the establishment of a perimeter with a DPS helicopter intended for the original AGT operation.

29.    During this time, the DPS helicopter alerted the AGT officers of an alleged vehicle theft occurring in the area around East 10th Street and Vanda Ave. in Lubbock, Texas. Lieutenant Collins-Koenig of Defendant City of Lubbock was close by and reportedly observed a white

Dodge Charger being backed out of a driveway at or around 823 Vanda Ave., Lubbock, Texas. Lieutenant Collins-Koenig allegedly observed the vehicle exit the driveway and accelerate away.

**C.  The Pursuit of the Dodge Challenger**

30.    At the time, it has been reported that the AGT officers in the area believed the alleged carjacking and vehicle theft was unrelated to the earlier vehicle pursuit.

31.    Without any clear direction, policy, or procedure, the AGT officers in the area, including multiple units from each Law Enforcement Entity Defendant, subsequently abandoned establishing a perimeter for the earlier vehicle pursuit in favor of conducting another vehicle pursuit of the Dodge Challenger.

32.    As the vehicle pursuit began, Defendant Corporal Brock Gruner, acting in official capacity as a police officer of the City of Lubbock, became the lead vehicle in pursuit.

33.    Defendant Gruner was a K-9 officer of Lubbock Police Department. Upon information and belief, Defendant Gruner was operating on behalf of the City of Lubbock as part of the AGT's operations on the day of the pursuit,.

34.    Upon information and belief, the law enforcement officers did not attempt to make a stop of the white Dodge Challenger but continued pursuing the vehicle through the area.

35.    Upon information and belief, as the vehicle pursuit continued, AGT officers and Defendant Gruner were (i) unaware of the identity of the driver, (ii) unaware whether the incident at the driveway constituted a car theft or some other altercation or dispute, (iii) and had no reason to believe that the driver of the vehicle was armed or presented a clear and present danger.[3]

---

[3] At no time have any of the law enforcement officers reported witnessing the driver with a weapon or firearm.

36.     Despite the lack of information and apparent danger, Defendant Gruner, AGT officers, and the DPS helicopter continued pursuing the vehicle  throughout the area. Eventually the vehicle pursuit continued north on Martin Luther King Jr. Blvd. in Lubbock, Texas.

37.     During this time, Defendant Gruner reportedly radioed out a request for permission from an AGT supervisor to ram his vehicle into the Dodge Challenger to force it to come to a stop. However, Defendant Gruner never received permission from any AGT supervisor or a supervisor from any of the Law Enforcement Entity Defendants.

38.     Shortly afterwards, while on Martin Luther King Jr. Blvd., the Dodge Challenger attempted to turn left onto Regis. St., but lost traction, spun out, and came to a stop.

39.     Still without authorization for use of force, Defendant Gruner chose to ram his vehicle into the Dodge Challenger after it had already come to a stop. Defendant Gruner's use of force forced the Dodge Challenger backwards toward the edge of the road. Defendant Gruner then rammed his vehicle again into the Dodge Challenger, forcing it into a grassy area beside the road.

40.     Other AGT officers arrived on the scene while this was occurring and began using their vehicles to block the path of the Dodge Challenger to contain the vehicle. Defendant Gruner then again rammed his vehicle into the Dodge Challenger forcing it back onto the road.

41.     At that point, the Dodge Challenger came to a stop on the road. Defendant Gruner and other AGT officers then performed a "box" maneuver to contain the Dodge Challenger. Specifically, Defendant Gruner and other AGT officers collided into the Dodge Challenger on all sides with their vehicles to contain the Dodge Challenger and stop any further movement.

42.     Upon information and belief, the "box" maneuver involved four to five law enforcement vehicles. Further the "box" maneuver was successful because the Dodge Challenger was blocked from moving outside the enclosure of the law enforcement vehicles.

43. After establishing a successful containment of the Dodge Challenger, Defendant Gruner and other officers approached the driver's side of the vehicle with their firearms drawn and aimed directly at the driver of the vehicle; Jasman Washington.

**D. The Killing of Jasman Washington**

44. While pointing their firearms directly at Mr. Washington, Defendant Gruner and other AGT officers ordered Mr. Washington to show his hands and to exit the Dodge Challenger. Mr. Washington immediately complied with the request and raised his hands in the air. However, Mr. Washington was unable to exist the vehicle as one of the law enforcement vehicles was blocking the driver's side door from opening.

45. The officers continued aiming their firearms at Mr. Washington as one of the officers moved the vehicle back slightly in order for Mr. Washington to exit.  Mr. Washington's vehicle remained unable to move due to the law enforcement containment.

46. Defendant Gruner and other AGT officers then attempted to open the driver's side door but were unable to open the door due to damage caused by the AGT officers' deliberate collusion with the door.

47. As a result, Officer Welty of Defendant City of Lubbock, used a window punch device against the drivers' side window. The window fragmented but did not shatter. Subsequently, several of the officers attempted to break the window by hand, and lowered their weapons. Defendant Gruner attempted to break the window by punching it with his bare hands, but was unsuccessful. All in all, there were approximately nine AGT officers, including Defendant Gruner, Defendant Ridley, and the John Doe Defendants, that were sounding the vehicle at this point.

48.     Upon information and belief, the AGT officers continued to attempt to break the window for several minutes until Mr. Washington slowly began driving his vehicle forward within the containment zone until it made contact with a law enforcement van.

49.     At this point, Defendant Ridley drew his firearm again and went directly up to the drivers' side window. Defendant Ridley then pointed the firearm directly at Mr. Washington. However, none of the other eight officers had redrawn their firearms. Upon information and belief, this is because there was no need for the use of deadly force due to the containment of the Dodge Challenger.

50.     The Dodge Challenger then slowly reversed approximately six to eight feet towards a gap between two of the law enforcement vehicles and made contact with the vehicles on both sides of the Dodge Challenger rear. The Dodge Challenger became wedged within the gap between the vehicles but was unable to go through.

51.     During this action, Defendant Ridley re-holstered his firearm. In addition, there approximately five officers, including Defendant Ridley and Defendant Griner, off to the side of the Dodge Challenger by the drivers' side when it filled the gap between the law enforcement vehicles. Approximately three other officers were spread out behind the law enforcement vehicles. Further, one of the officers had returned to one of the law enforcement vehicles that formed the gap, to further contain the Dodge Challenger.

52.     As the Dodge Challenger became wedged between the law enforcement vehicles, it was forcibly shifted towards the front of another law enforcement vehicle in the containment zone, which was off towards the drivers' side of the Dodge Challenger.

53.     After the Dodge Challenger was forcibly shifted, Defendant Ridley was standing approximately one to two feet in front of the outside of the Dodge Challenger's driver side wheel.

At this point, Defendant Ridley again drew his firearm and aimed it directly at Mr. Washington. None of the other officers had redrawn their firearms at this time.

54.    The Dodge Challenger then began moving forward at a very low speed of at or around 1.5 miles per hour. Immediately as the vehicle moved forward, one of the AGT officers yelled out on the law enforcement shared radio that Mr. Washington was "trying to ram an officer." However, there were no officers in the direct line of the vehicle as Defendant Ridley was standing to the outside of the vehicle's front drivers' side tire. Further, the vehicle had not made contact with any officer at this point.

55.    As the Dodge Challenger moved forward at the slow speed, Defendant Ridley chose to place his hand on outside drivers' side hood of the vehicle, and had left one leg at or around the likely path of the drivers' side wheel. The Dodge Challenger then continued moving forward approximately four feet or less, until it made contact with the law enforcement vehicle in its path.

56.    During this time, Defendant Ridley had not moved from his position. . The low speed of the Dodge Challenger resulted in contact to Defendant Ridley causing him to fall backwards and lose his balance for a moment.

57.    Defendant Ridley never fell to the ground, and, instead, immediately composed himself by aiming his firearm directly at Mr. Washington.

58.    While this was occurring, the AGT officer on the radio began yelling again that Mr. Washington was "trying to ram an officer." As the officer was yelling the phrase again, all the officers had redrawn their firearms and pointed them at Mr. Washington. By the time the officer had finished yelling the phrase again, the Dodge Challenger had come to a stop against the law enforcement vehicle in its path.

59.     In addition, the officer who had gone into one of the law enforcement vehicles that formed the gap[4] had placed the vehicle closer behind the Dodge Challenger. The actions of the officer closed the space in the gap and established a significantly more effective containment of the Dodge Challenger. As a result, the Dodge Challenger had approximately less than a foot in space to continue moving, and thus, was unable to continue any further attempts to flee.

60.     At that very moment, Mr. Washington presented no immediate threat and significant harm to any person or to any of the officers because as (i) there were no officers in the direct path in front of the Dodge Challenger, only a law enforcement vehicle, (ii) there were no officers in the direct path behind the Dodge Challenger, only the recently moved law enforcement vehicle, (iii) there were no innocent bystanders in the vicinity on the country highway as there were open fields surrounding the area, and (iv) the containment by the recently moved law enforcement vehicle eliminated any further attempts by Mr. Washington to flee.

61.     In addition, at no point did any of the officers see Mr. Washington with any weapon, even when the officers had been directly next to the vehicle as they attempted to open the stuck door. Nor did any of the officers have any information that would have led to a reasonable belief that Mr. Washington was armed.

62.     For all intents and purposes, at that exact moment, any reasonable, trained, and supervised officer would recognize that there remained no further threat and the vehicle pursuit of Mr. Washington had come to an end.

63.     However, at or around a second afterwards, Defendants Ridley, Gruner, and the John Doe Defendants, shot over twenty bullets at Mr. Washington while he sat in the vehicle that was contained and unable to move. One of the officers used one hand to fire multiple bullets at

---

[4] *See Supra,* at ¶ 50.

Mr. Washington from around a foot away. Defendant Gruner specifically fired seven bullets at Mr. Washington with his firearm. An eyewitness described the bullet fire as like a machine gun was being fired.

64.     After the hail of bullet fire, the officers approached the Dodge Challenger and saw Mr. Washington and believed him to be dead. The officers did not provide first aid once Mr. Washington's body was removed from the vehicle.

65.     None of the officers suffered any serious or life-threatening injuries. Upon information and belief, the Defendant Gruner suffered the most serious injuries of several cuts and scratches to his left arm that he received from attempting to punch through the vehicle window.

66.     The officers called for EMS personnel as standard procedure to "treat" Mr. Washington. However, Mr. Washington was officially pronounced deceased on scene by EMS personnel upon their arrival.

67.     Autopsy pictures of Mr. Washington's body revealed substantial blood loss and multiple gun- shot wounds throughout his body. Mr. Washington's upper body suffered the most wounds as there were multiple gun shot wounds on his upper chest and a significant gun shot wound on his neck.

### E.  **The Law Enforcement Entity Defendants Attempts to Justify the Killing**

68.     Immediately following the shooing, a representative from the DPS acting on behalf of the Law Enforcement Defendants, Sergeant Johnny Bures, issued a public statement through the local news.

69.     The public statement was filled with inaccuracies regarding the killing of Mr. Washington. Specifically, the statement falsely that (i) claimed that the incident began as a routine traffic stop of the first vehicle because it ran a red light and did not mention any involvement of

the AGT; (ii) claimed that there were only two individuals in the first vehicle, rather than three; (iii) ignored that the AGT officers that killed Mr. Washington did not know if he was related at all to the first vehicle; and (iv) did not mention Defendant Gruper's use of force by initially and repeatedly ramming into the Dodge Challenger.

70.     In addition, a local newspaper quoted Sgt. Bures as stating "[The officers] had a trooper that was pinned, [Mr. Washington's] using deadly force against our trooper, so [the officers] opened fire on [Mr. Washington]."[5] Sgt. Bures reported that Defendant Ridley had been "pinned" between the vehicles in an attempt to justify the killing of Mr. Washington.

71.      Later the same evening, Lubbock Police Department, on behalf of Defendant City of Lubbock, released an additional statement that did not align with Sgt. Bures initial statement.[6] The statement was significantly more accurate and specifically stated that officers that formed the AGT were responsible and that the officers were unaware if Mr. Washington was related to first vehicle pursuit. Further, the statement did not mention that Defendant Ridley had been "pinned."

72.     However, upon information and belief, the Lubbock Police Department's statement attempted to justify the killing by stating that Mr. Washington "injured a DPS trooper."

73.     The following day, on or around April 17, 2020, the Law Enforcement Entity Defendants issued a joint press release regarding the killing of Mr. Washington.[7] The press release closely followed the Lubbock Police Department's previous statement but provided further information regarding the identity of Mr. Washington. However, the statement did not correct the

---

[5] *See* GABRIEL MONTE, LUBBOCK AVALANCHE-JOURNAL, LAW ENFORCEMENT IDENTIFIES VICTIM IN THURSDAY SHOOTING (2020), https://www.lubbockonline.com/story/news/crime/2020/04/17/law-enforcement-identifies-victim-in-thursday-shooting/1337433007/

[6] *See* STAFF, EVERYTHING LUBBOCK, LPD SAYS HIGH-SPEED POLICE CHASE ENDS WITH ONE SUSPECT DEAD (2020), https://www.everythinglubbock.com/news/local-news/high-speed-police-chase-ends-with-shots-fired-thursday-afternoon-in-lubbock/

[7] *See* STAFF, EVERYTHING LUBBOCK, LPD, DPS, LCSO ISSUE UPDATE ON THURSDAY'S DEADLY OFFICER INVOLVED SHOOTING (2020), https://www.everythinglubbock.com/news/local-news/lpd-issues-update-on-thursdays-officer-involved-shooting/

inaccurate statements of Sgt. Bures by affirmatively stating that Defendant Ridley had not been pinned by Mr. Washington's vehicle.

74.     As a result, local news continued to inaccurately report that Defendant Ridley had been pinned as the main justification for the use of deadly force.[8]

75.     Around that time, on or around April 17, 2020,  Plaintiff learned that her brother, Mr. Washington, had been killed when their mother called her in tears. Plaintiff's mother had learned about Mr. Washington's death in a local news report based on the joint press release by the Law Enforcement Entity Defendants.

76.     On the same day, the Law Enforcement Entity Defendants individually filed a "Peace Officer Involved Injuries or Death Report" with the Texas Attorney General's Office, as required by Tex.. Crim. P. Art. 2.139.  Each of the reports stated that Mr. Washington had "carried, exhibited, or used a deadly weapon."

77.     Later that night, Detective Price and another officer from Defendant City of Lubbock arrived at Plaintiff's home. Plaintiff was on the phone with her mother when Detective Price informed them that Mr. Washington was dead. Immediately, Plaintiff began breaking down in tears while her mother was emotionally devastated.

78.     However, Detective Price did not attempt to console Plaintiff or her other family members present. Detective Price was instead aggressive and combative with Plaintiff and her other family members. Upon information and belief, Detective Price main goal was to continue the objective of the Law Enforcement Entity Defendants: justifying the use of deadly excessive force.

---

[8] *See* KCBD, POLICE IDENTIFY SUSPECT IN OFFICER-INVOLVED SHOOTING (2020)
https://www.kcbd.com/2020/04/17/police-identify-suspect-officer-involved-shooting/shooting/

79.    On or around May 1, 2020, Defendant City of Lubbock filed an amended Custodial Death Report with the Texas Attorney General's Office. The report provided more information but was mainly focused on justifications for the use of deadly excessive force by incorrectly reporting that Mr. Washington drove directly at Defendant Ridley and by misclassifying the incident as displaying an immediate threat to officer safety at the time when officers fired their firearms.

80.    Several days later, on or around May 4, 2020, Defendant City of Lubbock organized a shooting review board made up of members of the Lubbock police department. The review board submitted a written report to Floyd Mitchell, the Lubbock Police Department Chief of Police. The report justified the use of deadly excessive force by inaccurately stating that Trooper Ridley had to jump out of the way of the Dodge Challenger, ignoring the slow speed of the vehicle at that time, and classifying Mr. Washington as attempting to "ram" Defendant Ridley.

81.    Further, the report did not acknowledge the actions of the officer that closed the space in the gap behind the vehicle and established a significantly more effective containment making it impossible for Mr. Washington to escape before the Defendants used deadly excessive force.

82.    Lastly, the report did not mention that Defendant Gruner had been disciplined for another incident eight months prior in or around August 2019. Specifically, on or around August 20, 2019, Defendant Gruner was placed on administrative leave with pay effective immediately until further notice. Defendant Gruner had been placed on same type of administrative leave immediately following the killing of Mr. Washington. Upon information and belief, Defendant City of Lubbock was aware of at least other serious incident involving Defendant Gruner.

**F.  Defendant City of Lubbock's Unconstitutional Use-of-force policies**

83.     Defendant City of Lubbock's General Ordinances include the official use-of-force policies for the Lubbock Police Department.[9] The General Ordinances are ordained by the final policymaker of Defendant City of Lubbock.[10]

84.     The use-of-force ordinances state that "the conduct of police officers in preventing offenses about to be committed in their presence or within their view shall be regulated by the same rules as are prescribed for the action of the person about to be injured. They may use all force necessary to repel the aggression."[11]

85.     The rules for the action of the person about to be injured state "Whenever, in the presence of a police officer of the city or within his view, one person is about to commit an offense against the person or property of another, it is the duty of such police officer to prevent it and, for this purpose, he may summon any number of citizens of the city to his aid. He must use the amount of force necessary to prevent the commission of the offense, and no greater."[12]

86.     Defendant City of Lubbock's written use-of-force polices directly contradicts established law regarding the use of deadly force because the focus of Defendant City of Lubbock's policy is on preventing the commission of the offense, rather than the threat-of-harm factor. *See Harmon v. City of Arlington, Tex.*, 16 AF.4th 1159, 1163 (5th Cir. 2021) ("The threat-of-harm factor typically predominates the analysis when deadly force has been deployed.")

87.     Further, Defendant City of Lubbock's use-of-force policy does not factor in any understanding of the reasonable threat of serious harm to the officer or others. *See id.* (citing *Manis*

---

[9] Lubbock, Texas, Code of Ordinances, Art. 2.07.008, available at
https://z2codes.franklinlegal.net/franklin/Z2Browser2.html?showset=lubbockset. 2.07.008
[10] *See* Lubbock, Texas, Charter, Sec. 2, available at
https://z2codes.franklinlegal.net/franklin/Z2Browser2.html?showset=lubbockset .
[11] Lubbock, Texas, Code of Ordinances, Art. 2.07.008, available at
https://z2codes.franklinlegal.net/franklin/Z2Browser2.html?showset=lubbockset.
[12] *Id.* at 2.07.006.

*v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)) ("this court's cases hold that '[a]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others.'")

88.     As a result, Defendant City of Lubbock officers are required to act on a facially unconstitutional policy in situations involving the use of deadly force.

89.     Upon information and belief, Defendant Ridley relied on this unconstitutional policy and instruction when he fired seven bullets at Mr. Washington with the goal to prevent the commission of any further offense, despite the fact that at the time Mr. Washington presented no reasonable immediate threat of serious harm to any officer or others.

### G. The Failure to Construct a Unified Policy and Training for the AGT

90.     Defendant City of Lubbock's shooting review board acknowledged that the main issues arising from the killing of Mr. Washington were due to the combination of officers from the different Law Enforcement Entity Defendant under the AGT responding according to their own agency's individual policies, procedures, customs, tactics, and training.

91.     As a result, the report highlighted the failure by the Law Enforcement Entity Defendants to jointly adopt a unified standard operating procedure and policy for the AGT and recommended the adoption of such a policy because of the inherent dangers involved in such operations.

92.     In addition, the U.S. Department of Justice ("DOJ") has developed specific guidelines for operations such as the AGT.[13] The guidelines are for establishing and operating gang intelligence units and task forces; and were prepared by the DOJ alongside the Gang

---

[13] U.S. Dept. of Justice, *Guidelines for Establishing and Operating Gang Intelligence Units and Task Forces* (2008), https://bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/guidelines_for_establishing_gang_intelligence_units.pdf

Intelligence Strategy Committee, the Global Intelligence Working Group, the Criminal Intelligence Coordinating Council, and the Global Justice Information Sharing Initiative.[14]

93.    The DOJ guidelines specifically state that it is imperative that an operation such as the AGT develop a comprehensive task force policies and procedures manual to ensure performance consistency and accountability, reduce liability, and create a professional environment.[15] Further, the DOJ guidelines state that the absence of relevant policies and procedures creates significant risks of violating constitutional rights, such as with use of force, thereby incurring liability for the law enforcement agencies involved.[16]

94.    Here, , the failure to have written risk management policies and procedures in a joint gang task force failed to provide comprehensive operational planning among the officers involved from different law enforcement agencies and therefore failed to provide  written/defined leadership and personnel roles,

95.    Lastly, the DOJ guidelines state that a unified and written critical incident response plan is deeply important to adequately prepare the officers for responding to critical incidents safely without violating constitutional rights that may incur liability for a parent law enforcement agency or for the task force.[17]

96.    The DOJ guidelines stress the importance of a unified and written policy for an anti-gang task force because it is inherently difficult to manage a multi-agency law enforcement operation.[18].

---

[14] *See id.*
[15] *Id,*
[16] *See id.*
[17] *See id.*
[18] *Id.*

97.     Upon information and belief, Defendants were intimately aware of DOJ guidelines regarding multi-agency law enforcement operation because Defendants work with the DOJ to conduct narcotics operations within Lubbock County.[19]

98.     In addition, upon information and belief, Defendant Lubbock County received specific grants from the Texas Office of the Governor, Public Safety Office in order to conduct AGT operations in Lubbock, Texas. The grant program required the Law Enforcement Entity Defendants to (i)"institute a collaborative working network of collocated multi-jurisdictional anchor agencies and resources" and (ii) "enhance a regional, multidisciplinary approach using coordinated gang prevention, intervention and suppression efforts."[20]

99.     Therefore, based on the DOJ guidelines and the Texas Office of the Governor, Public Safety Office's requirements, it was necessary and imperative to build a unified, coordinated, and collaborative policy and training for the operations of the AGT.

100.     Upon information and belief, it was overwhelmingly obvious that sending officers from the various Law Enforcement Entity Defendants to conduct gang raids, vehicle pursuits, and arrests of dangerous individuals without a  jointly adopted unified and written policy would likely lead to situations involving the deprivation of constitutional rights, such as with the use of deadly excessive force.

101.     Despite this guidance, the Law Enforcement Entity Defendants deliberately chose to not adopt a unified policy or to train the AGT officers on conducting multi-agency operations without committing the use of excessive deadly force.

---

[19] *See* AMBER STEGALL, KFDA, DEPT. OF JUSTICE IDENTIFIES 40 SUSPECTS IN 'OPERATION TASTE THE RAINBOW' (2021), https://www.newschannel10.com/2021/09/10/dept-justice-identifies-40-suspects-operation-taste-rainbow/
[20] Tex. Office of the Governor, Pub. Safety Office: Homeland Security Grants Division, *Funding Announcement: FY2021 Texas Anti-Gang Program* (2021), TG-TAG_Announce-com_PY21.pdf (county.org) https://www.county.org/TAC/media/TACMedia/Legislative/Grant-Opportunities/TG-TAG_Announce-com_PY21.pdf

102.    Ultimately the failures of the Law Enforcement Defendants to adopt a unified policy or conduct training were a major cause of Mr. Washington's death due to the use of deadly excessive force.

**H. Jasman Washington's death and its impact on his family**

103.    Mr. Washington was thirty-one (31) years old when he was killed by the Defendants. He was a valuable member of his family and deeply loved by Plaintiff, his mother, and his cousins.

104.    Plaintiff has suffered substantially from the death of her brother by virtue of the destruction of the sibling relationship, including the right to love, affection, solace, comfort, companionship, society, emotional support, and happiness. Plaintiff will continue to suffer anguish, grief, and sorrow because of Mr. Washington's death and is likely to continue to suffer for a significant period of time.

105.    Plaintiff especially will remember being unable to display her brother's body during his funeral because of the significant damage done to his body by the Defendants.

**AS AND FOR A FIRST CAUSE OF ACTION FOR A VIOLATION OF**
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Deadly Excessive Force)**
**(As to Defendant Ridley, Defendant Gruner, and the John Doe Defendants)**

106.    Plaintiff repeats and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

107.    The conduct alleged herein deprived Plaintiff, on behalf of Mr. Washington, of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment right to be free from free from excessive use of force against Mr. Washington that violated his clear established constitutional rights, and was not objectively reasonable under the circumstances.

108.    It is well established that the reasonableness of a deadly excessive force inquiry is confined to whether an officer was in immediate danger at the exact moment that resulted in the officer's use of deadly force. *See Harris v. Serpas*, 745 F.3d 767, 773 (5th Cir. 2014) (citing *Rockwell v. Brown,* 664 F.3d 985, 992-93 (5th Cir.2011)). Any analysis of a deadly excessive force claim does not look at any other moment in time, besides the moment of the use of deadly force. *See id.* Any of events or actions leading up to the shooting are not relevant for the purposes of an excessive force inquiry. *See id.* at 772.

109.    Deadly force violates the Fourth Amendment unless the officer had probable cause to believe that the suspect posed a threat of **immediate** serious or significant harm to the officers or others at the exact moment of the use of deadly force. *See Sanchez v. Fraley,* 376 Fed.Appx.449, 453 (5th Cir. 2010) (quoting *Bazan ex rel. Bazan v. Hidalgo County,* 246 F.3d 481, 493 (5th Cir.2001)) (emphasis added).

110.    Mr. Washington was killed as a direct result of the Defendants' use of force that was objectively unreasonable as the facts at the moment of deadly force indicated Mr. Washington presented no immediate threat of serious or significant harm to any person or to any of the officers.

111.    At that moment (i) there were no officers in the direct path in front of the Dodge Challenger, only a law enforcement vehicle, (ii) there were no officers in the direct path behind the Dodge Challenger, only the recently moved law enforcement vehicle, (iii) there were no innocent bystanders in the immediate vicinity on the country highway as there were open fields surrounding the area, (iv) the containment by the recently moved law enforcement vehicle eliminated any further attempts by Mr. Washington to flee or continue the vehicle pursuit, and (v) Mr. Washington had been driving at very low speeds.

112.    Defendants conduct violated Mr. Washington's clearly established constitutional right to be free from excessive force without an **immediate** serious or significant threat at the moment of deadly force. *See, e.g., Reyes v. Bridgewater,* 362 Fed. Appx. 403, 409 (5th Cir. 2009) ("The cases on deadly force are clear: an officer cannot use deadly force without an immediate serious threat to himself or others.")

113.    As a result of Defendants' use of deadly excessive force, Mr. Washington was killed  as Defendants shot over twenty bullets directly at him from a short distance with the absolute certainty of  causing Mr. Washington's death.

114.    Plaintiff's requests for relief are set forth below.

### <u>AS AND FOR A SECOND CAUSE OF ACTION FOR A VIOLATION OF</u><br>42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights<br>(Municipal Liability)<br>(As to Defendant City of Lubbock)

115.    Plaintiff repeats and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

116.    Defendant's written use-of-force ordinances instruct officers to use "the amount of force necessary to prevent the commission of the offense, and no greater," to determine the lawfulness of the use of deadly force.

117.    Defendant's final policymaker, Defendant's City Council, created and promulgated Defendant's use-of-force ordinances.

118.    It is well settled that officers must determine the lawfulness of the use of deadly by examining the threat-of-harm factor. *See Harmon,* 16 AF.4[th] at 1163. The threat-of-harm factor predominates the analysis when deadly force has been deployed. *Id.* As a result, an officer must analyze the constitutionality of deadly force through a reasonable assessment of the threat of immediate serious or significant harm. *See id.* (citing *Manis v. Lawson*, 585 F.3d 839, 843 (5th

Cir. 2009)) ("this court's cases hold that '[a]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others.'").

119.    However, Defendant's written use-of-force policy is intended to analyze the crime, rather than threat of serious harm to the officer or others. As a result, is not intended to have Defendant's officers' factor in the Fourth Amendment constitutionality of the use of deadly force

120.    Further, Defendant's written use-of-force policy does not require officers to consider the reasonability of force necessary to prevent the commission of an offense. Instead, it is the duty of Defendant's officer to use whatever force they determine is necessary to prevent the offense. As a result, the policy defines constitutionality without reasonability, in defiance of well settled law.

121.    A municipality's policies that ignore the United States Supreme Court's interpretation of the Constitution are facially unconstitutional. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Therefore, Defendant's use-of-force policy is facially unconstitutional, and instructs Defendant's officers to act unconstitutionally in the use of deadly force.

122.    Defendant Gruner acted on Defendant's facially unconstitutional policy on the use and at the moment of deadly force, Mr. Washington presented no immediate threat of serious or significant harm to any person or to any of the officers. Instead, Defendant Gruner acted on the instructions he received from Defendant on the use of deadly force through using his subjective belief on the necessary deadly force to end the commission of Mr. Washington's crimes.

123.    As a result, Defendant's official use-of-force policy was a moving force behind Mr. Washington's death and deprivations of his constitutional rights.

124.    Plaintiff's requests for relief are set forth below.

**AS AND FOR A THIRD CAUSE OF ACTION FOR A VIOLATION OF**
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Failure to Adopt Policies and Training)**
**(As to Defendant City of Lubbock, Defendant Lubbock County, and Defendant Lubbock**
**County Sheriff's Office)**

125.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

126.    Defendants failed to organize the AGT with standard operating procedures, policies, and practices related to coordinating Defendants officers on addressing gang-related criminal activities. Defendants failed to utilize any training methods to ensure coordination among the ATG officers.

127.    Defendant Lubbock County and Defendant Lubbock County Sheriff's Office active involvement with the Texas Office of the Governor, Public Safety Office's requirements for an interagency gang task force indicated that the Defendants were aware of the need to establish standard operating procedures, policies, and practices for their officers operating in the AGT.

128.    Defendants law enforcement relationship with the DOJ and the DPS regarding drug trafficking, alongside the multi-agency DOJ guidelines for anti-gang operations,  clearly gave notice to Defendants about the overwhelming need to develop a unified standard operating procedure and training for officers operating under the AGT to avoid the deprivation of constitutional rights.

129.    As a result, it was obvious to Defendants that the likely consequences of failing to adopt standard, unified policies and procedures or conducting training would deprive individuals of their constitutional rights, especially in regard to the use of force.

130.    When the likely consequence of a municipality failing to adopt a policy is the deprivation of constitutional rights; then the municipality can be deliberately indifferent to the constitutional violations by its officers. *See Porter v. Epps*, 659 F.3d 440, 447 (5th Cir. 2011).

Further, a municipality is deliberately indifferent when it has actual or constructive notice that a failure to adopt a policy or conduct training would violate constitutional rights. *See id.* (citing *Connick v. Thompson,* —— U.S. ——, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011)).

131.    Defendants deliberate indifference to conduct operations without standard unified operating procedures or polices and without conducting joint training caused significant issues throughout Defendants' AGT operations on or around April 16, 2020.

132.    Specifically, the failure of Defendants manifested in (i) the haphazard approach to operations on or around April 16, 2020, (ii) the failure to establish an effective perimeter with the initial vehicle pursuit, (iii) the failure to initially establish an effective containment of the Dodge Challenger, (iv) the exaggeration by the officer that Mr. Washington was "trying to ram an officer" when he was traveling at or around 1.5 miles per hour without an officer in the direct path of his vehicle, (v) the lack of reasonable communication between the officer reestablishing containment and the other officers, (vi) the firing of over twenty bullets at Mr. Washington while only a few feet away and when he posed no immediate threat, and (vii) the firing of bullets in the direction of other AGT officers.

133.    As a result, Defendants' failures to adopt necessary policy or training for the AGT had a causal factor in the use of deadly excessive force against Mr. Washington, and were a causing factor for his death.

134.    Plaintiff's requests for relief are set forth below.

**AS AND FOR A FOURTH CAUSE OF ACTION FOR A VIOLATION OF**
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Wrongful Death)**
**(As to all Defendants)**

135.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

136.    Defendants' previously established violations of Mr. Washington's constitutional rights led to Mr. Washington suffering from significant bullet wounds.

137.    Defendants' constitutional violations more likely than not led to Mr. Washington instant death from the bullet wounds.

138.    Plaintiff's requests for relief are set forth below.

**AS AND FOR A FIFTH CAUSE OF ACTION FOR A VIOLATION OF**
**TEX. CIV. PRAC. & REM. CODE § 71.004**
**(Wrongful Death)**
**(As to all Defendants)**

139.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

140.    Defendants' previously established violations of Mr. Washington's constitutional rights led to Mr. Washington suffering from significant bullet wounds.

141.    Defendants' constitutional violations more likely than not led to Mr. Washington instant death from the bullet wounds.

142.    Plaintiff's requests for relief are set forth below.

**DEMAND FOR JURY TRIAL**

143.    Plaintiff demands a jury trial on all matters raised in this Complaint.

## PRAYERS FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants as follows:

A.  A declaration that the practices complained of herein are unlawful and unconstitutional violations of the Mr. Washington's rights under U.S. Const. Amend. IV and 42 U.S.C. § 1983;

B.  Awarding Plaintiff their reasonable and necessary attorneys' fees and expenses which Plaintiff has incurred and will continue to incur during all trial and appellate court proceedings pursuant to 42 U.S.C. § 1983;

C.  That the Court retain jurisdiction over Defendants until such time as it is satisfied that they have remedied the practices complained of and are determined to be in full compliance with the law;

D.  Awarding Plaintiff such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable;

E.  Awarding Plaintiff, as the representative of the Estate of Mr. Washington, survival damages for conscious pain and mental anguish prior to Mr. Washington's Death, funeral and burial expenses, and exemplary damages pursuant to TEX. CIV. PRAC. & REM. CODE § 71.021;

F.  Awarding Plaintiff, as wrongful death beneficiary of Mr. Washington, damages for mental anguish, loss of companionship and society, and pecuniary loss pursuant to TEX. CIV. PRAC. & REM. CODE § 71.004.

Plaintiffs also seek injunctive relief, including, but not limited to:

A.  Training on appropriate use-of-force and de-escalation tactics for all law enforcement officials employed by Defendants; especially in regards to inter-agency operations;

B.  Supervisory discipline up to and including termination for any employee or agent of Defendants who engages in such unlawful arrest and excessive force;

C.  Supervisory discipline up to and including termination for any employee or agent of Defendants involved in the incidents described herein; and

D.  Monitoring by this Court to ensure that compliance by Defendants with all injunctive relief ordered by this Court.

Plaintiff further demands that she be awarded such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

Dated: April 18, 2022                                         Respectfully submitted,

*/s/ David W. Henderson*
David W. Henderson
Texas State Bar No. 24032292
dhenderson@equalrights.law
Jay D. Ellwanger
Texas State Bar No. 24036522
jellwanger@equalrights.law
**ELLWANGER LAW LLLP**
400 S. Zang Blvd. Ste. 600
Dallas, TX 75208
Telephone: (469) 998-6775
Facsimile:  (469) 998-6775

***COUNSEL FOR PLAINTIFF***