**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | | |
|---|---|---|
| **BRITTANY WHITE, as the Personal Representative on behalf of the Estate of JASMAN WASHINGTON, and MICHELLE WHITE, individually as the surviving mother of JASMAN WASHINGTON,** | § § § § § § § | |
| **Plaintiffs,** | § § | **CIVIL ACTION NO: 5:22-CV-71** |
| **v.** | § § | **JURY TRIAL DEMANDED** |
| **CITY OF LUBBOCK, LUBBOCK COUNTY SHERIFF'S OFFICE, LUBBOCK COUNTY, TROOPER JOHN RIDLEY, CORPORAL BROCK GRUNER, OFFICER JOHN DOE ONE, OFFICER JOHN DOE TWO, and OFFICER JOHN DOE THREE.** | § § § § § § § | |
| **Defendants.** | § | |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

Plaintiff BRITTANY WHITE on behalf of the estate of her deceased brother, JASMAN

WASHINGTON, and Plaintiff MICHELLE WHITE on behalf of herself as the surviving parent

of JASMAN WASHINGTON (collectively "Plaintiffs"), by and through their attorneys, brings

this action for damages and other legal and equitable relief from Defendants CITY OF LUBBOCK,

LUBBOCK COUNTY SHERIFF'S OFFICE, LUBBOCK COUNTY, TROOPER RIDLEY,

CORPORAL BROCK GRUNER, JOHN DOE OFFICER ONE, JOHN DOE OFFICER TWO,

and JOHN DOE OFFICER THREE. (collectively "Defendants"), for violations of rights under the

United States Constitution, including protections against excessive force under the Fourth

Amendment in violation of 42 U.S.C.A. § 1983, failures to adopt policies or training in violation

of U.S.C.A. § 1983, failures to discipline in violation of U.S.C.A. § 1983, and any other cause(s)

of action that can be inferred from facts set forth herein.

**FIRST AMENDED COMPLAINT**

1

## INTRODUCTION

1.      This is an action brought by Plaintiffs, Brittany White and Michelle White, individually and on behalf of their deceased family member, Jasman Washington ("Mr. Washington"), against Defendants for the use of deadly excessive force that unlawfully killed Mr. Washington through heavy gunfire and under the color of law; and in violation of individual rights under the Fourth Amendment of the United States Constitution, in violation of civil rights pursuant to 42 U.S.C § 1983, and for wrongful death claims pursuant to the Texas Tort Claims Act.

2.      On or around April 16, 2020, Defendants City of Lubbock, Lubbock County Sheriff's Office, and Lubbock County (collectively "Law Enforcement Entity Defendants"), acting collectively under the banner of an Anti-Gang Taskforce ("AGT"), did not adopt joint unified policies for law enforcement officers operating in the AGT, thereby leading to the deprivation of constitutional rights. The Law Enforcement Entity Defendants then failed to properly train, supervise, discipline, counsel, or otherwise control officers acting in coordination under the AGT.

3.      The Law Enforcement Entity Defendants' joint failures to adequately discipline and train law enforcement officers acting in coordination under the AGT, failure to implement the necessary polices for the AGT; and implementation of unconstitutional policies, caused approximately five law enforcement officers, including Defendant Ridley, Defendant Gruner, and the John Doe Defendants (collectively "Officer Defendants"), to unlawfully fire over twenty bullets at Mr. Washington while Mr. Washington was not an immediate threat; thereby causing Mr. Washington to suffer unwarranted, unlawful, and excruciating physical pain, mental anguish, and, ultimately, causing Mr. Washington's death.

4.      In unlawfully firing multiple bullets at Mr. Washington, the Officer Defendants consciously disregarded the constitutional rights of Mr. Washington knowing that the Law

**FIRST AMENDED COMPLAINT**

Enforcement Entity Defendants would approve and/or ratify their actions. Subsequently, and as of this time, the Law Enforcement Entity Defendants have not formally disciplined any of the law enforcement officers involved in the killing of Mr. Washington.

5.      As a result of Defendants' unlawful actions, Plaintiff Michelle White, individually as the mother of Mr. Washington, and Plaintiff Brittany White, as the personal representative of Mr. Washington's estate, are entitled to injunctive relief and the recovery of damages pursuant to violations of rights under the United States Constitution, including protections against deadly excessive force under the Fourth Amendment under 42 U.S.C.A. § 1983; failures to train, supervise, or discipline, resulting in the deprivation of constitutional rights under 42 U.S.C.A. § 1983; unlawful official policies or absence of polices that were a moving factor the law enforcement officers' use of deadly excessive force against Plaintiff under 42 U.S.C.A. § 1983; wrongful death under 42 U.S.C.A. § 1983; and for wrongful death under Tex. Civ. Prac. & Rem. Code § 71.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; and (iii) 42 U.S.C.A. § 1983.

7.      The Court's supplemental jurisdiction is invoked by 28 U.S.C. § 1367(a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of

**FIRST AMENDED COMPLAINT**

operative facts such that they form part of the same case or controversy under Article III of the United States Constitution.

8.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## **PARTIES**

9.     Brittany White ("Ms. Brittany White") is and has been, at all relevant times, a resident of the State of Texas and a resident of Lubbock County Texas. Ms. Brittany White sues on behalf of Jasman Washington as the personal representative and administrator of the Estate of Mr. Washington.

10.     Michelle White ("Ms. Michelle White") is and has been, at all relevant times, a resident of the State of Texas and a resident of Lubbock County Texas. Ms. Michelle White sues on behalf of herself, as the wrongful death beneficiary of her son, Mr. Washington.

11.     Lubbock County is a local governing municipality within Texas that funds the Lubbock County Sheriff's Office and is within the Northern District of Texas.

12.     Lubbock County Sheriff's Office is a local law enforcement entity within Lubbock County, Texas and establishes, operates, and supervises all final official policies regarding law enforcement operations within Lubbock County, Texas, on behalf of itself and Defendant Lubbock County. Lubbock County Sheriff's Office, on behalf of itself and of Defendant Lubbock County, is responsible for the implementation of its budget, policies, procedures, practices, and customs, as well as the acts and omissions of its law enforcement officers based on these policies and the training of each officer within all law enforcement operations. Lubbock County Sheriff's Office is within the Northern District of Texas.

**FIRST AMENDED COMPLAINT**

13.     The City of Lubbock is a local governing municipality located in Lubbock County, Texas. The City of Lubbock funds and operates the Lubbock Police Department. Under the Lubbock City Charter, the Lubbock Police Department is delegated with official policymaking authority to establish, operate and supervise polices and law enforcement operations, in final accordance with Defendant City of Lubbock's Ordinances, and towards the suppression of crime and the arrest of individuals within the City of Lubbock.[1] In addition, the Lubbock Police Department, on behalf of the City of Lubbock, is responsible for the implementation of its budget, policies, procedures, practices, and customs, as well as the acts and omissions of its law enforcement officers based on these policies and the training of each officer within all law enforcement operations..[2] The City of Lubbock is within the Northern District of Texas.

14.     Trooper John Ridley is a law enforcement officer with the Texas Department of Public Safety ("DPS") and is sued in his individual and official capacity. At all relevant times, Ridley was acting under the color of law as a DPS Law Enforcement Officer in coordination with the Law Enforcement Entity Defendants' officers under the AGT.

15.     Corporal Brock Gruner is a law enforcement officer with Defendant City of Lubbock and is sued in his individual and official capacity. At all relevant times, Gruner was acting under the color of law as a Lubbock Police Department Officer in coordination with other Law Enforcement Entity Defendants' officers under the AGT.

16.     Officer John Doe One is a law enforcement officer and is sued in his individual and official capacity. At all relevant times, Officer John Doe One was acting under the color of law as

---

[1] Lubbock, Texas, Code of Ordinances, Art. 2.07, Division 1. available at https://ci.lubbock.tx.us/departments/city-secretary/home/city-charter.
[2] *Id.*

**FIRST AMENDED COMPLAINT**

a Law Enforcement Officer in coordination with other Law Enforcement Entity Defendants' officers under the AGT.

17.     Officer John Doe Two is a law enforcement officer and is sued in his individual and official capacity. At all relevant times, Officer John Doe Two was acting under the color of law as a Law Enforcement Officer in coordination with other Law Enforcement Entity Defendants' officers under the AGT.

18.     Officer John Doe Three is a law enforcement officer and is sued in his individual and official capacity. At all relevant times, Officer John Doe Three was acting under the color of law as a Law Enforcement Officer in coordination with other Law Enforcement Entity Defendants' officers under the AGT.

## STATEMENT OF FACTS

### A. The Anti-Gang Task Force

19.     In or around April 2020, Defendants City of Lubbock, Lubbock County Sheriff's Office, and Lubbock County, were operating collectively under an Anti-Gang Taskforce ("AGT") with the Texas Department of Public Safety ("DPS") to combat gang-related violence in Lubbock County, Texas.

20.     The Law Enforcement Entity Defendants organized the AGT as a multi-agency law enforcement task force with a defined purpose to suppress gang activities. However, the Law Enforcement Entity Defendants failed to organize the AGT with any standard operating procedures, policies, practices, or training in place.

21.     Instead, the law enforcement officers that comprised the AGT conducted law enforcement operations based on their own Law Enforcement Entity's policies, procedures, customs, tactics, and training.

**FIRST AMENDED COMPLAINT**

6

22.     Upon information and belief, the Law Enforcement Entity Defendants were deliberately indifferent towards joint unified policies necessary for appropriate lawful practices and procedures during anti-gang law enforcement operations.

23.     The Law Enforcement Entity Defendants further did not provide their respective law enforcement officers with the appropriate joint unified training towards maintaining lawful practices, such as the lawful use of force, when operating as part of an interagency task force or in coordination with other Law Enforcement Entity Defendant officers.

**B.  The Initial Operations of the AGT on or around April 16, 2020**

24.     On or around April 16, 2020, law enforcement officers from the Law Enforcement Entity Defendants were jointly operating under the AGT to conduct an anti-gang law enforcement operation in Lubbock, Texas.

25.     Later the same day, on or around 2:00 PM, AGT officers were operating near 1700 East Dartmouth Street, Lubbock, TX 79403. While operating in this area, some of the AGT officers noticed a vehicle that had been reportedly stolen earlier in the day.

26.     AGT officers unsuccessfully attempted to conduct a stop of the vehicle, as the vehicle drove away. AGT officers then engaged in a pursuit of the vehicle throughout the area.

27.     Eventually, the vehicle came to a stop at or around the intersection of East 10th Street and Ute Avenue in Lubbock, Texas. Following the stop, AGT officers allegedly observed three individuals exit the vehicle and flee on foot.

28.     AGT officers apprehended and arrested one of the individuals, Tabrick Johnson, at or around the area of East 10th Street and Walnut Ave. in Lubbock, Texas.

29.     After the AGT officers took Mr. Johnson into custody, AGT officers set up a perimeter within the area to search for an unidentified woman who allegedly fled on foot. AGT

**FIRST AMENDED COMPLAINT**

officers received aid in the establishment of a perimeter with a DPS helicopter. The DPS helicopter was intended for the original AGT law enforcement operation.

30.     During this time, the DPS helicopter alerted AGT officers of an alleged vehicle theft occurring in the area around East 10th Street and Vanda Ave. in Lubbock, Texas. Lieutenant Collins-Koenig of Defendant City of Lubbock was close by and allegedly observed a white Dodge Charger backing out of a driveway at or around 823 Vanda Ave., Lubbock, Texas.

### C.  **The Pursuit of the Dodge Challenger**

31.     At the time, AGT officers in the area believed Lieutenant Collins-Koenig had observed an alleged carjacking and vehicle theft. But AGT officers believed the alleged vehicle theft was wholly unrelated to the earlier vehicle pursuit by AGT officers.

32.     Without any clear directions, policies, or procedures, the AGT officers in the area, including multiple units from each Law Enforcement Entity Defendant, abandoned establishing a perimeter for the earlier vehicle pursuit in order to conduct another vehicle pursuit of the Dodge Challenger.

33.     As the vehicle pursuit began, Defendant Gruner, acting in his official capacity as a police officer of Defendant City of Lubbock, became the lead vehicle in pursuit.

34.     At the time, Defendant Gruner was a K-9 officer of Lubbock Police Department. Upon information and belief, Defendant Gruner was operating on behalf of Defendant City of Lubbock as part of the AGT's operations.

35.     Upon information and belief, the AGT officers did not attempt to make a stop of the white Dodge Challenger, and instead immediately began pursuing the vehicle.

36.     Upon information and belief, as the vehicle pursuit continued, AGT officers and Defendant Gruner were:

**FIRST AMENDED COMPLAINT**

(i)     Unaware of the identity of the driver;

(ii)    Unaware whether the incident at the driveway constituted a car theft or some other altercation or dispute; and

(iii)   Had no reason to believe that the driver of the vehicle was armed or presented a clear and present danger.[3]

37.     Despite this lack of information and the absence of apparent danger, Defendant Gruner, AGT officers, and the DPS helicopter continued pursuing the vehicle throughout the area.

38.     Eventually, the pursuit of the Dodge Challenger continued north on Martin Luther King Jr. Blvd. in Lubbock, Texas.

39.     During this time, Defendant Gruner reportedly radioed out a request for permission from an AGT supervisor to ram his vehicle into the Dodge Challenger to force it to come to a stop. However, Defendant Gruner never received permission from any AGT supervisor or a supervisor from the Law Enforcement Entity Defendants.

40.     Shortly afterwards, while on Martin Luther King Jr. Blvd., the Dodge Challenger attempted to turn left onto Regis. St., but lost traction, spun out, and came to a stop.

41.     Without authorization for use of force, Defendant Gruner chose to ram his vehicle into the Dodge Challenger after it had already come to a stop, in an apparent move to end the pursuit and any alleged ongoing crime. Defendant Gruner's use of force caused the Dodge Challenger to move backwards toward the edge of the road. Defendant Gruner then rammed his vehicle into the Dodge Challenger again, forcing it into a grassy area beside the road as the cars continued to move.

---

[3] None of the law enforcement officers reported witnessing the driver with a weapon or firearm, and none of the Defendants have stated that the driver had a weapon or was armed.

**FIRST AMENDED COMPLAINT**

42.     Other AGT officers arrived on the scene while this was occurring and began using their vehicles to block the path of the Dodge Challenger to attempt containment of the vehicle. Defendant Gruner again rammed his vehicle into the Dodge Challenger, and forced it back onto the road.

43.     At this point, the Dodge Challenger came to a stop on the road. Defendant Gruner and other AGT officers then performed a "box" maneuver to contain the Dodge Challenger. The "box" maneuver involved Defendant Gruner and other AGT officers colliding into the Dodge Challenger on all sides with their vehicles in order to contain the Dodge Challenger and stop any further movement.

44.     The "box" maneuver involved at least four to five law enforcement vehicles. The "box" maneuver was apparently successful because the Dodge Challenger could not move beyond the enclosure of the law enforcement vehicles. At this point, at least eleven law enforcement vehicles surrounded the Dodge Challenger.

45.     After the apparent containment of the Dodge Challenger, Defendant Gruner and other AGT officers approached the driver's side of the vehicle with their firearms drawn and aimed directly at the driver of the vehicle, Jasman Washington.

**D.  The Killing of Jasman Washington**

46.     While pointing their firearms directly at Mr. Washington, Defendant Gruner and other AGT officers ordered Mr. Washington to show his hands and exit the Dodge Challenger. Mr. Washington immediately complied with the request and raised his hands in the air. However, Mr. Washington was unable to exit the vehicle because a law enforcement vehicle blocked the driver's side door from opening.

**FIRST AMENDED COMPLAINT**

47.     The AGT officers continued aiming their firearms at Mr. Washington while one officer moved the law enforcement vehicle back slightly in order for Mr. Washington to exit. Mr. Washington's vehicle did not move.

48.     Defendant Gruner and other AGT officers then attempted to open the driver's side door but were unable to open it due to damage caused by the AGT officers' deliberate collisions with the door.

49.     As a result, Officer Welty of Defendant City of Lubbock, used a window punch device against the driver's side window. The window fragmented but did not shatter. Subsequently, the AGT officers attempted to break the window by hand. At this time, all the AGT officers had lowered their weapons. Upon information and belief, the AGT officers lowered their weapons because Mr. Washington was unarmed and posed no immediate threat.

50.     Defendant Gruner attempted to break the window by punching it with his bare hands, but was unsuccessful. Overall, there were at least nine AGT officers, including Defendant Gruner, Defendant Ridley, and the John Doe Defendants, who surrounded the Dodge Challenger at this point.

51.     Upon information and belief, the AGT officers continued their attempt to break the window until Mr. Washington slowly began driving his vehicle forward within the containment zone; and until it made contact with a law enforcement van.

52.     At this point, Defendant Ridley drew his firearm again and went directly up to the driver's side window. Defendant Ridley then pointed the firearm directly at Mr. Washington. However, none of the other officers had redrawn their firearms. Upon information and belief, the other AGT officers did not redraw their firearms because there was no need to use deadly force because of the containment of the Dodge Challenger.

**FIRST AMENDED COMPLAINT**

53.     The Dodge Challenger then slowly reversed approximately six to eight feet towards a gap between two of the law enforcement vehicles and made contact with the vehicles on both sides of the Dodge Challenger's rear. The Dodge Challenger became wedged within the gap between the vehicles but was unable to move through the gap or move any farther in reverse.

54.     During this action, Defendant Ridley re-holstered his firearm. At this point, there were approximately five officers, including the Officer Defendants, off to the side of the Dodge Challenger's driver's side door. Approximately three other officers had spread out behind other law enforcement vehicles. Upon information and belief, another officer returned to one of the law enforcement vehicles that formed the gap to further contain the Dodge Challenger.

55.     But the Dodge Challenger's contact between the law enforcement vehicles of the rear gap caused the Challenger to forcibly shift towards the direction of another law enforcement vehicle in the containment zone, which was located off towards the driver's' side of the Dodge Challenger.

56.     After the Dodge Challenger was involuntarily and forcibly shifted, Defendant Ridley was standing approximately one to two feet in front of the outside of the Dodge Challenger's driver's side tire. At this point, Defendant Ridley again redrew his firearm and aimed it directly at Mr. Washington. None of the other officers had redrawn their firearms at this time.

57.     The Dodge Challenger then began moving forward at  low speed, approximately 1.5 miles per hour. Immediately as the vehicle moved forward, one of the AGT officers incorrectly yelled out on a AGT radio that Mr. Washington was "trying to ram an officer." However, there were no officers in the direct line of the Dodge Challenger as Defendant Ridley was standing towards the outside of the vehicle's front driver's side tire and the Dodge Challenger had not made contact with any officer.

**FIRST AMENDED COMPLAINT**

58.     As the Dodge Challenger slowly moved forward, Defendant Ridley chose to place his hand on the outside of the driver's side part of the vehicle's hood and had one leg that was at or around the likely path of the driver's side tire. The Dodge Challenger then continued moving forward approximately four feet or less, until it made contact with the law enforcement vehicle in its direct path.

59.     During this time, Defendant Ridley chose not to move from his position. As a result, the Dodge Challenger made contact with Defendant Ridley's leg at a very slow speed.

60.     Defendant Ridley never fell to the ground or suffered any apparent injury. Instead, Defendant Ridley immediately composed himself and aimed his firearm directly at Mr. Washington.

61.     While this was occurring, an AGT officer again incorrectly yelled on the shared radio that Mr. Washington was "trying to ram an officer." During this time, several of the AGT officers redrew their firearms and aimed them at Mr. Washington. By the time the officer had finished yelling the phrase again, the Dodge Challenger had come to a complete stop against the law enforcement vehicle in its direct path.

62.     During this time, the officer who had gone into one of the law enforcement vehicles that formed the gap[4] drove his vehicle closer behind the Dodge Challenger. The actions of the officer closed the space behind the Dodge Challenger and established a significantly more effective containment of the vehicle. As a result, the Dodge Challenger had less than approximately one foot of space to continue moving, and thus, was effectively unable to continue any further attempts to flee.

---

[4] *See Supra,* at ¶ 50.

**FIRST AMENDED COMPLAINT**

63.     At this very moment in time, Mr. Washington presented no immediate threat and/or significant harm to any person or to any of the officers because:

(i)     There were no law enforcement officers in the direct path in front of the Dodge Challenger, only a law enforcement vehicle blocking its path;

(ii)    There were no law enforcement officers in the direct path behind the Dodge Challenger, only the recently moved law enforcement vehicles and other law enforcement vehicles containing the Challenger's movement;

(iii)   There were no innocent bystanders in the general vicinity on the country highway because open fields surrounded the vehicle containment; and

(iv)    The containment by the recently moved law enforcement vehicle effectively eliminated any possibility of an attempt to flee.

64.     Additionally, at no point did any of the officers see Mr. Washington with any weapon, even when the AGT officers were directly next to the vehicle while they attempted to open the driver's side door. Nor did any of the officers have any plausible information that would have led to a reasonable belief that Mr. Washington was armed.

65.     At this exact moment in time, any reasonable, trained, and supervised officer would recognize that there remained no further threat and that the vehicle pursuit of Mr. Washington had come to an end.

**FIRST AMENDED COMPLAINT**

66.     However, Defendants Ridley, Gruner, and the John Doe Defendants continued aiming their guns at Mr. Washington for approximately one second after the Dodge Challenger stopped moving, was unable to flee, and while there continued to be no immediate threat to the officers or any bystanders; as pictured below:



67.     Defendants Ridley, Gruner, and the John Doe Defendants then shot over twenty bullets at Mr. Washington in the immediate moment in time following the above picture, despite the clear absence of any immediate threat, and while Mr. Washington sat unarmed in the fully contained Dodge Challenger.

68.     One of the officers used a single hand to fire multiple bullets at Mr. Washington from around a foot away. Defendant Gruner specifically fired seven bullets at Mr. Washington with his firearm.

**FIRST AMENDED COMPLAINT**

69.     After the hail of bullet fire, the AGT officers approached the Dodge Challenger and saw Mr. Washington, and immediately believed he was dead. The officers did not provide first aid after they removed Mr. Washington's body from the vehicle.

70.     Some of the officers called for EMS personnel as required by their Law Enforcement Entity's standard procedures in order to "treat" Mr. Washington. Upon arrival, the EMS personnel officially pronounced Mr. Washington deceased on scene.

71.     None of the officers involved suffered any serious or life-threatening injuries. Upon information and belief, Defendant Gruner suffered the most "serious" injury of several cuts and scratches to his left arm that he received from a wild attempt to punch through the Dodge Challenger's window.

72.     Autopsy pictures of Mr. Washington's body revealed substantial blood loss and multiple gun-shot wounds revealing that the bullets tore through his body, and ended his life.

**E.    The Law Enforcement Entity Defendants' Attempts to Justify the Killing**

73.     Following the killing of Mr. Washington by the AGT officers, Sergeant Johnny Bures, a representative from the DPS acting on behalf of the Law Enforcement Defendants, issued a public statement through the local news.

74.     Sgt. Bures, on behalf of the Law Enforcement Defendants, filled the public statement with inaccuracies regarding the killing of Mr. Washington. Specifically, the statement:

(i)     Falsely claimed that the incident began as a routine traffic stop of a vehicle running a traffic light;

(ii)    Did not mention any involvement of the AGT;

(iii)   Falsely claimed that there were allegedly two individuals in the first vehicle, rather than three;

**FIRST AMENDED COMPLAINT**

16

(iv)     Ignored that the AGT officers that killed Mr. Washington did not know if

he was related at all to the first vehicle pursuit; and

(v)     Did not mention Defendant Gruner's initial use of force of repeatedly

ramming into the Dodge Challenger.

75.     A local newspaper quoted Sgt. Bures stating "[The officers] had a trooper that was

pinned, [Mr. Washington] us[ed] deadly force against our trooper, so [the officers] opened fire on

[Mr. Washington]."[5] Upon information and belief, Sgt. Bures falsely reported that Defendant

Ridley had been "pinned" between the vehicles in an attempt to justify the unlawful killing of Mr.

Washington.

76.      Later the same evening, the Lubbock Police Department, on behalf of Defendant

City of Lubbock, released an additional statement that did not align with Sgt. Bures initial

statement.[6] The statement was more accurate and stated that the officers that formed the AGT were

responsible and that the officers were unaware if Mr. Washington was related to first vehicle

pursuit.[7] Further, the statement did not mention that Defendant Ridley had been "pinned."[8]

77.     However, upon information and belief, the Lubbock Police Department's statement

attempted to justify the unlawful killing by stating that Mr. Washington "injured a DPS trooper."

78.     The following day, on or around April 17, 2020, the Law Enforcement Entity

Defendants issued a joint press release about the unlawful killing of Mr. Washington.[9]

---

[5] *See* GABRIEL MONTE, LUBBOCK AVALANCHE-JOURNAL, LAW ENFORCEMENT IDENTIFIES VICTIM IN THURSDAY
SHOOTING (2020), https://www.lubbockonline.com/story/news/crime/2020/04/17/law-enforcement-identifies-victim-
in-thursday-shooting/1337433007/
[6] *See* STAFF, EVERYTHING LUBBOCK, LPD SAYS HIGH-SPEED POLICE CHASE ENDS WITH ONE SUSPECT DEAD (2020),
https://www.everythinglubbock.com/news/local-news/high-speed-police-chase-ends-with-shots-fired-thursday-
afternoon-in-lubbock/
[7] *Id.*
[8] *Id.*
[9] *See* STAFF, EVERYTHING LUBBOCK, LPD, DPS, LCSO ISSUE UPDATE ON THURSDAY'S DEADLY OFFICER INVOLVED
SHOOTING (2020), https://www.everythinglubbock.com/news/local-news/lpd-issues-update-on-thursdays-officer-
involved-shooting/

**FIRST AMENDED COMPLAINT**

17

79.     The press release closely followed the Lubbock Police Department's previous statement but provided further information regarding the identity of Mr. Washington.[10] But the statement failed to correct the inaccurate and false statements of Sgt. Bures and failed to confirm that Defendant Ridley had not been pinned by Mr. Washington's vehicle.[11]

80.     As a result, local news continued to inaccurately report that a vehicle had pinned Defendant Ridley as the main justification for the unlawful use of deadly force and the killing of Mr. Washington.[12]

81.     At or around this time, Plaintiff Ms. Brittany White learned that the Defendants killed her brother, Mr. Washington, when Plaintiff Ms. Michelle White called Ms. Brittany White in tears. Ms. Michelle White had learned about Mr. Washington's death in a local news report that was based on the joint press release provided by the Law Enforcement Entity Defendants.

82.     On the same day, the Law Enforcement Entity Defendants individually filed "Peace Officer Involved Injuries or Death Report[s]" with the Texas Attorney General's Office, as required by TEX. CRIM. P. ART. 2.139.  Each of the reports falsely stated that Mr. Washington had "carried, exhibited, or used a deadly weapon."

83.     Later that night, Detective Price of Defendant City of Lubbock and another officer from Defendant City of Lubbock arrived at Ms. Brittany White's home. Ms. Brittany White was on the phone with Ms. Michelle White when Detective Price informed the Plaintiffs that Mr. Washington was dead. Immediately, Ms. Brittany White began breaking down in tears while Ms. Michelle White was emotionally devastated. Detective Price did nothing; in fact, he strangely became aggressive with Plaintiffs.

---

[10] *See id.*
[11] *See id.*
[12] *See* KCBD, POLICE IDENTIFY SUSPECT IN OFFICER-INVOLVED SHOOTING (2020)
https://www.kcbd.com/2020/04/17/police-identify-suspect-officer-involved-shooting/shooting/

**FIRST AMENDED COMPLAINT**

84.     On or around April 16, 2020, the same day as the shooting, Defendant City of Lubbock placed Defendant Gruner on administrative leave with pay effective immediately for his role in the unlawful killing of Mr. Washington.

85.     Defendant Gruner received the same type of administrative leave approximately eight months earlier, on or around August 20, 2019. Defendant City of Lubbock thus was aware of at least one other serious incident involving Defendant Gruner but allowed Defendant Gruner to operate in violent anti-gang operations as an AGT officer.

86.     On or around April 22, 2020, Police Chief Floyd Mitchell of Defendant City of Lubbock organized a shooting review board made up of supervisory members of the Lubbock Police Department in order to review the killing of Mr. Washington.

87.     On or around May 1, 2020, Defendant City of Lubbock filed an amended Custodial Death Report with the Texas Attorney General's Office. The report provided more information but was mainly focused on continuing to justify the unlawful use of deadly excessive force by falsely reporting that Mr. Washington drove directly at Defendant Ridley. The report also falsely classified the incident as an immediate threat to officer safety at the time that officers fired their guns.

88.     On or around May 5, 2020, the review board submitted their final written report to Chief Mitchell. The report (i) falsely claimed that Defendant Ridley had to "jump out" of the direct path of the Dodge Challenger, (ii) ignored the slow speed of the vehicle at that time, and (iii) misleadingly classified Mr. Washington actions as an attempt to "ram" Defendant Ridley.

89.     The report also did not acknowledge the actions of the AGT officer that closed the space in the gap behind the Dodge Challenger and established a more effective containment;

**FIRST AMENDED COMPLAINT**

thereby making it effectively impossible for Mr. Washington to flee before the Defendant Officers used deadly excessive force.

90.     Lastly, the report did not mention that Defendant City of Lubbock placed Defendant Gruner on administrative leave for another incident eight months prior.

91.     On or around June 14, 2020, Chief Mitchell, on behalf of Defendant City of Lubbock, accepted the report by the shooting review board. As a result, Defendant City of Lubbock took no further actions and failed to discipline Defendant Gruner.

92.     Upon information and belief, Defendant City of Lubbock utilized false statements, misleading claims, and omitted significant facts to justify the unlawful use of deadly excessive force that killed Mr. Washington; and to refrain from disciplining any of the law enforcement officers involved.

## F.  Defendant City of Lubbock's Unconstitutional Use-of-Force policies

93.     Defendant City of Lubbock's Ordinances include the official use-of-force policies for the Lubbock Police Department.[13] Defendant City of Lubbock utilizes the Ordinances to create policies necessary to protect health, life, property, and to establish order and security of the city and its inhabitants.[14] The Ordinances are enacted by the final legislative and governing body of Defendant City of Lubbock, the Lubbock City Council.[15]

94.     Defendant City of Lubbock's use-of-force ordinances state:

> The conduct of police officers in preventing offenses about to be committed in their presence or within their view shall be regulated by the same rules as are prescribed for the action of the person about to be injured. They may use all force necessary to repel the aggression.[16]

---

[13] Lubbock, Texas, Code of Ordinances, Art. 2.07.008, available at https://ci.lubbock.tx.us/departments/city-secretary/home/city-charter.
[14] *See* Lubbock, Texas, Charter, Chap. 1, Art. 2, Sec. 2. available at https://ci.lubbock.tx.us/departments/city-secretary/home/city-charter.
[15] *See id.* at Chap. 1, Art. 9, Sec. 9.
[16] Lubbock, Texas, Code of Ordinances, Art. 2.07.008.

**FIRST AMENDED COMPLAINT**

95.     The ordinances for the "action of the person about to be injured" state:

> Whenever, in the presence of a police officer of [Defendant City of Lubbock] or within his view, one person is about to commit an offense against the person or property of another, it is the duty of such police officer to prevent it and, for this purpose, he may summon any number of citizens of the city to his aid. <u>He must use the amount of force necessary to prevent the commission of the offense, and no greater.</u>[17]

96.     Defendant City of Lubbock's written use-of-force ordinances, enacted by the Lubbock City Council, directly contradict established law regarding the use of deadly force by law enforcement officers because the focus of Defendant City of Lubbock's use-of-force ordinances are towards preventing the commission of the offense, rather than the threat-of-harm factor. *See Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1163 (5th Cir. 2021) ("The threat-of-harm factor typically predominates the analysis when deadly force has been deployed.")

97.     Further, Defendant City of Lubbock's use-of-force ordinances do not factor in or require the evaluation of the reasonable threat of serious harm to an officer or others. *See id.* (citing *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)) ("this court's cases hold that '[a]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others.'")

98.     As a result, Defendant City of Lubbock required its law enforcement officers to act on a facially unconstitutional policy in situations involving the use of deadly force.[18] Defendant City of Lubbock thus required Defendant Gruner to rely on this facially unconstitutional use-of-force policy during law enforcement operations as an officer on behalf of Defendant City of Lubbock.

---

[17] *Id.* at 2.07.006. (emphasis added).
[18] *See* Lubbock, Texas, Charter, Chap. 1, Art. 2, Sec. 2 ("[Defendant] City of Lubbock shall have the power to …enact and enforce ordinances on any and all subjects.)

**FIRST AMENDED COMPLAINT**

99.     Upon information and belief, Defendant Gruner relied on this unconstitutional policy and instruction when he fired seven bullets at Mr. Washington. Defendant Gruner acted with the goal to prevent the commission of any further alleged offense, even though Mr. Washington presented no reasonable immediate threat of serious harm to any officer or others at the time of his killing.

### G. The Failure to Construct Unified Policies and Training for the AGT

100.     Defendant City of Lubbock's shooting review board acknowledged fundamental issues arising from the killing of Mr. Washington due to the combination of law enforcement officers from different Law Enforcement Entity Defendants operating under the AGT according to their own agency's individual policies, procedures, customs, tactics, and training.

101.     The report further highlighted failures by the Law Enforcement Entity Defendants to jointly adopt unified standard operating procedures, policies, or training for the AGT, and recommended the adoption of such unified policies because of the inherent dangers involved in conducting anti-gang operations.

102.     The U.S. Department of Justice ("DOJ") has developed specific guidelines for operations such as the AGT.[19] The guidelines are intended for law enforcement entities operating joint multi-agency gang intelligence units and task forces; and was prepared by the DOJ alongside the Gang Intelligence Strategy Committee, the Global Intelligence Working Group, the Criminal Intelligence Coordinating Council, and the Global Justice Information Sharing Initiative.[20]

103.     The DOJ guidelines specifically state that it is <u>imperative</u> that a multi-agency operation, such as the AGT, develop comprehensive task force policies/procedures manuals to

---

[19] U.S. Dept. of Justice, *Guidelines for Establishing and Operating Gang Intelligence Units and Task Forces* (2008), https://bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/guidelinesforestablishinggangintelligenceunits.pdf
[20] *See id.*

**FIRST AMENDED COMPLAINT**

ensure performance consistency and accountability, <u>reduce liability</u>, and to create a professional environment.[21] Further, the DOJ guidelines state that the <u>absence of unified policies and procedures creates significant risks of the violation of constitutional rights</u>, such as with excessive use of force, thereby increasing the likelihood of liability for a law enforcement entity involved in a multi-agency law enforcement operation .[22]

104.    The DOJ guidelines also highlight the importance of unified written risk management policies and procedures, comprehensive operational planning among the officers involved from different law enforcement entities, and written/defined leadership and personnel roles within a multi-agency law enforcement operation.[23]

105.    Lastly, the DOJ guidelines state that unified and written <u>critical incident response plans</u> are deeply important to adequately prepare officers for responding to critical incidents safely and to avoid the deprivation of constitutional rights that may incur liability for a parent law enforcement agency or for the multi-agency task force.[24]

106.    Ultimately, the DOJ guidelines stress that all these elements of unified written policies and unified training for an anti-gang task force are necessary because it is inherently difficult to manage a multi-agency law enforcement operation.[25] Upon information and belief, the Law Enforcement Entity Defendants did not follow any of these guidelines with the AGT.

107.    Upon information and belief, the Law Enforcement Entity Defendants' final policymakers had actual notice of the DOJ guidelines regarding multi-agency law enforcement

---

[21] *Id.* (emphasis added).
[22] *See id.* (emphasis added).
[23] *See id.*
[24] *See id.* at p. 31. (a critical incident includes "intentional or accidental shootings," "serious assault or injury to a team member," "exposure to a traumatic event (e.g., officer-involved shooting)," "serious injury to or fatality of an in-custody suspect," "barricade or hostage incident," or "vehicle collisions resulting in death or serious injury.")
[25] *Id.*

**FIRST AMENDED COMPLAINT**

operations because the Law Enforcement Entity Defendants commissioned programs with the DOJ to conduct joint multi-agency anti-narcotics operations within Lubbock County, Texas.[26]

108.     In addition, Defendant Lubbock County and Defendant Lubbock County Sheriff's Office received specific grants from the Texas Office of the Governor, Public Safety Office to conduct the AGT's operations in Lubbock, Texas.

109.     The grant program required the Law Enforcement Entity Defendants to (a) institute a collaborative working network of multi-jurisdictional anchor agencies and resources and (b) enhance a regional, multidisciplinary approach using coordinated gang prevention, intervention and suppression efforts.[27] As a result, Defendant Lubbock County and Defendant Lubbock County Sheriff's Office had actual notice of these policy requirements because they applied for and received the public grants.

110.     The DOJ guidelines and the Texas Office of the Governor, Public Safety Office's requirements demonstrate that it was necessary and imperative for the Law Enforcement Entity Defendants to build unified, coordinated, and collaborative policies and training for the operations of the AGT in order to avoid the high likelihood that uncoordinated and untrained AGT officers would commit violations of constitutional rights during violent anti-gang operations.

111.     Defendant Lubbock County and Defendant Lubbock County Sheriff's Office had actual notice of the policy requirements by the Texas Office of the Governor, Public Safety Office because they applied for and received the grants to create the AGT with Defendant City of Lubbock.

---

[26] *See* AMBER STEGALL, KFDA, DEPT. OF JUSTICE IDENTIFIES 40 SUSPECTS IN 'OPERATION TASTE THE RAINBOW' (2021), https://www.newschannel10.com/2021/09/10/dept-justice-identifies-40-suspects-operation-taste-rainbow/
[27] Tex. Office of the Governor, Pub. Safety Office: Homeland Security Grants Division, *Funding Announcement: FY2021 Texas Anti-Gang Program* (2021), TG-TAG_Announce-com_PY21.pdf (county.org) https://www.county.org/TAC/media/TACMedia/Legislative/Grant-Opportunities/TG-TAG_Announce-com_PY21.pdf

**FIRST AMENDED COMPLAINT**

112.     Therefore, Law Enforcement Defendants had actual knowledge that sending their officers to conduct joint multi-agency gang raids, vehicle pursuits, and arrests of gang-related individuals without jointly adopted unified written policies or training would lead to situations involving the deprivation of constitutional rights, including the use of deadly excessive force.

113.     Despite the overwhelmingly obvious need for jointly adopted unified and written policies or training, the Law Enforcement Entity Defendants deliberately chose to allow AGT officers to operate without any unified policies or training necessary to avoid the high likelihood that the officers would violate constitutional rights, such as with the use of deadly excessive force.

114.     The failures of the Law Enforcement Entity Defendants to adopt unified policies or conduct joint training was a significant cause of Mr. Washington's death through the Officer Defendants' use of deadly excessive force.

## H.  Jasman Washington's death and its impact on his family

115.     Mr. Washington was thirty-one (31) years old when Defendants killed him on April 16, 2020. He was a valuable member of his family and deeply loved by Plaintiff Ms. Brittany White, Plaintiff Ms. Michelle White, and other family members.

116.     Ms. Michelle White has suffered substantially from the death of her son by virtue of the destruction of the parental relationship, including the right to love, affection, solace, comfort, companionship, society, emotional support, and happiness. Ms. Michelle White has continued to suffer anguish, grief, and sorrow because of Mr. Washington's death and is likely to continue to suffer for a significant period of time.

117.     Ms. Michelle White will especially remember being unable to display her son's body during his funeral because of the severe damage done to his body by the Defendants, and

**FIRST AMENDED COMPLAINT**

will remember the refusal of Defendants to acknowledge, apologize, or explain the Defendants conduct that unlawfully killed her son, Jasman Washington.

**AS AND FOR A FIRST CAUSE OF ACTION FOR A VIOLATION OF**
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Deadly Excessive Force)**
**(As to Defendant Ridley, Defendant Gruner, and the John Doe Defendants)**

118.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

119.    The conduct alleged herein deprived Plaintiffs, on behalf of Mr. Washington, of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment right to be free from excessive use of force. The conduct violated Mr. Washington's clearly established constitutional rights, and was not objectively reasonable under the circumstances.

120.    It is well established that the reasonableness of a deadly excessive force inquiry is confined to whether an officer was in immediate danger at the exact moment that resulted in the officer's use of deadly force. *See Harris v. Serpas*, 745 F.3d 767, 773 (5th Cir. 2014) (citing *Rockwell v. Brown,* 664 F.3d 985, 992-93 (5th Cir.2011)). Any analysis of a deadly excessive force claim does not look at any other moment in time, besides the exact moment that officers used deadly force. *See id.* Any events or actions leading up to the shooting are not relevant for the purposes of a deadly excessive force inquiry. *See id.* at 772.

121.    Further, deadly force always violates the Fourth Amendment unless an officer had probable cause to believe that the suspect posed a threat of immediate serious or significant harm to the officers or others at the exact moment deadly force is used. *See Sanchez v. Fraley,* 376 Fed.Appx.449, 453 (5th Cir. 2010) (quoting *Bazan ex rel. Bazan v. Hidalgo County,* 246 F.3d 481, 493 (5th Cir.2001)) (emphasis added).

**FIRST AMENDED COMPLAINT**

122.    Mr. Washington was killed as a direct result of the Officer Defendants' use of force that was objectively unreasonable at the moment of that deadly force was used. The facts indicate that Mr. Washington presented no immediate threat of serious or significant harm to any person or to any of the officers at the exact moment deadly force was used.

123.    At that moment:

(i)     There were no law enforcement officers in the direct path in front of the Dodge Challenger, only a law enforcement vehicle blocking its path;

(ii)    There were no law enforcement officers in the direct path behind the Dodge Challenger, only the recently moved law enforcement vehicles and other law enforcement vehicles containing the Challenger's movement;

(iii)   There were no innocent bystanders in the general vicinity on the country highway because open fields surrounded the highway;

(iv)    The containment by the recently moved law enforcement vehicle eliminated any possibility of an attempt to flee;

(v)     Mr. Washington had been driving at low speeds without a reasonable risk of causing harm; and

(vi)    Mr. Washington was unarmed.

124.    The Officer Defendants' conduct violated Mr. Washington's clearly established constitutional right to be free from excessive force <u>without an immediate serious or significant threat at the moment of deadly force</u>. *See, e.g., Reyes v. Bridgewater,* 362 Fed. Appx. 403, 409 (5th Cir. 2009) ("The cases on deadly force are clear: an officer cannot use deadly force without an immediate serious threat to himself or others.") (emphasis added).

**FIRST AMENDED COMPLAINT**

125.    The Defendant Officers fired over twenty bullets directly at Mr. Washington from a short distance with the absolute certainty of causing Mr. Washington's death; thereby killing Mr. Washington as a result of the Officer Defendants' use of deadly excessive force,

126.    Plaintiffs' requests for relief are set forth below.

**AS AND FOR A SECOND CAUSE OF ACTION FOR A VIOLATION OF**
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Municipal Liability)**
**(As to Defendant City of Lubbock)**

127.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

128.    The conduct alleged herein deprived Plaintiffs, on behalf of Mr. Washington, of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment right to be from excessive use of force.

129.    Defendant City of Lubbock's written use-of-force ordinances instruct officers to use "the amount of force necessary to prevent the commission of the offense, and no greater," in order to determine the lawfulness of the officer's use of deadly force.

130.    Defendant City of Lubbock's final policymaker, the Lubbock City Council, created and promulgated Defendant City of Lubbock's use-of-force ordinances.

131.    It is well settled law that officers must determine the lawfulness of the use of deadly force by examining the threat-of-harm factor. *See Harmon,* 16 F.4th at 1163. The threat-of-harm factor predominates the analysis when officers deploy deadly force. *Id.* As a result, an officer must analyze the constitutionality and lawfulness of deadly force through a reasonable assessment of the threat of immediate serious or significant harm. *See id.* (citing *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)) ("this court's cases hold that '[a]n officer's use of deadly force is not excessive,

**FIRST AMENDED COMPLAINT**

and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others.'").

132.    However, Defendant City of Lubbock's written use-of-force policy is intended to analyze the crime, rather than threat of serious harm to the officer or others. Therefore, Defendant City of Lubbock's written use-of-force policy is not intended to have officers consider the threat of serious harm in their use of deadly force, and instructs officers to disregard this Fourth Amendment constitutional requirement.

133.    Defendant City of Lubbock's written use-of-force policy also does not require officers to consider the reasonability of force necessary to prevent the commission of an offense. Instead, Defendant City of Lubbock requires its officers to use whatever force that the officer determines is necessary to prevent an offense. As a result, the Defendant City of Lubbock's use-of-force policy defines lawful use of force without reasonability, in defiance of well settled law.

134.    A municipality's policies that ignores or runs counter to well-settled interpretations of the Constitution is facially unconstitutional. *See Monell v. Dep't of Social Servs*., 436 U.S. 658 (1978). Therefore, Defendant City of Lubbock's use-of-force policy is facially unconstitutional, and instructs Defendant's officers to act unconstitutionally in their use of deadly force.

135.    Defendant Gruner acted on Defendant's facially unconstitutional policy on at the moment deadly force was used against Mr. Washington, and while Mr. Washington presented no immediate threat of serious or significant harm to any person or to any of the AGT officers. Defendant Gruner acted on the requirements and instructions he received from Defendant City of Lubbock's written ordinances on the use of deadly force, and thus used his subjective belief towards the necessary deadly force to end the commission of Mr. Washington's alleged crimes.

**FIRST AMENDED COMPLAINT**

136.     As a result, Defendant City of Lubbock's written official use-of-force policy was a moving force behind Mr. Washington's death and the deprivations of his constitutional rights.

137.     Plaintiffs' requests for relief are set forth below.

### AS AND FOR A THIRD CAUSE OF ACTION FOR A VIOLATION OF
### 42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights
### (Failure to Adopt Policies and Training)
### (As to Defendant City of Lubbock, Defendant Lubbock County, and Defendant Lubbock County Sheriff's Office)

138.     Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

139.     The conduct alleged herein deprived Plaintiffs, on behalf of Mr. Washington, of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment right to be from excessive use of force.

140.     The Law Enforcement Entity Defendants' official policymakers failed to organize the AGT with standard operating procedures, policies, and practices related to coordinating Law Enforcement Entity Defendants' officers on addressing gang-related criminal activities. The Law Enforcement Entity Defendants' official policymakers also failed to utilize any training methods to ensure coordination among the AGT officers.

141.     Defendant Lubbock County Sheriff's Office's, on behalf of itself and Defendant Lubbock County, active involvement with the Texas Office of the Governor, Public Safety Office's requirements for an interagency gang task force established that the Law Enforcement Entity Defendants had actual notice of the need and requirement to establish unified standard operating procedures, policies, and practices for their officers operating in the AGT.

142.     Additionally, the Law Enforcement Entity Defendants' law enforcement relationship with the DOJ and the DPS during joint multi-agency anti-drug trafficking operations

**FIRST AMENDED COMPLAINT**

provided the Law Enforcement Entity Defendants' official policymakers with actual notice of the DOJ guidelines for joint multi-agency law enforcement operations.

143.     Based on the actual notice of the DOJ Guidelines and the Texas Office of the Governor, Public Safety Office's requirements, the Law Enforcement Entity Defendants' official policymakers were aware of the overwhelming need to develop unified standard operating procedures, policies, and training for officers operating under the AGT in order to avoid the deprivation of constitutional rights.

144.     As a result, it was obvious to the Law Enforcement Entity Defendants that the likely consequences of failing to adopt unified standard unified policies and procedures or conducting joint unified training would deprive individuals of their constitutional rights, especially regarding the unlawful use of force during anti-gang operations.

145.     When the likely consequence of a municipality failing to adopt a policy is the deprivation of constitutional rights; then the municipality can be found to be deliberately indifferent to the constitutional violations by its officers. *See Porter v. Epps*, 659 F.3d 440, 447 (5th Cir. 2011). Further, a municipality is deliberately indifferent when it has actual or constructive notice that a failure to adopt a policy or conduct training would violate constitutional rights. *See id.* (citing *Connick v. Thompson,* 131 S.Ct. 1350, 1360(2011)).

146.     Therefore, the Law Enforcement Entity Defendants were deliberately indifferent towards adopting unified standard policies or adopting training for the AGT despite actual notice that such failures would lead to violations of constitutional violations. The Law Enforcement Entity Defendants' deliberate indifference to conduct operations without unified standard operating procedures or polices, and without conducting joint training thus caused significant issues throughout the AGT operations on or around April 16, 2020.

**FIRST AMENDED COMPLAINT**

147.   Specifically, the failures of the Law Enforcement Entity Defendants manifested in:

(i)      The haphazard and chaotic approach to AGT operations on or around April 16, 2020;

(ii)     The failure to establish an effective perimeter following the initial earlier vehicle pursuit;

(iii)    The decision to conduct a second vehicle pursuit of the Dodge Challenger without any knowledge or awareness of whether the vehicle was related to the earlier pursuit, and without any knowledge or awareness whether Dodge Challenger leaving a driveway constituted a car theft or some other altercation or dispute;

(iv)    The destruction of the drivers' side door of the Dodge Challenger, thereby causing the door to not open;

(v)     The failure to scale down aggression and operations after Mr. Washington raised his hands in the air to offer himself up for arrest;

(vi)    The repeated radio call that by an AGT officer that inaccurately yelled that Mr. Washington was "trying to ram an officer" despite the fact that Mr. Washington was traveling at or around 1.5 miles per hour without an officer in the direct path of his vehicle;

(vii)   The lack of reasonable communication between the AGT officer reestablishing containment and the other AGT officers;

(viii)  The firing of bullets in the direction of other AGT officers; and

(ix)    The firing of over twenty bullets at Mr. Washington while he was only a few feet away and posed no immediate threat.

**FIRST AMENDED COMPLAINT**

32

148.    The Law Enforcement Entity Defendants' failures to adopt necessary policies or training for the AGT thus had a causal factor in the use of deadly excessive force that killed Mr. Washington.

149.    Plaintiffs' requests for relief are set forth below.

**AS AND FOR A FOURTH CAUSE OF ACTION FOR A VIOLATION OF**
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Municipal Liability – Failure to Discipline)**
**(As to Defendant City of Lubbock, Defendant Lubbock County, and Defendant Lubbock County Sheriff's Office)**

150.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

151.    The conduct alleged herein deprived Plaintiffs, on behalf of Mr. Washington, of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment right to be from excessive use of force.

152.    A claim of a failure to discipline requires (i) a supervisor failed to discipline a subordinate official, and (ii) a causal link exists between the failure to discipline and the violation of constitutional rights. *See Edwards v. Oliver,* 2019 WL 4603794 at *13 (N.D. Tex. 2019) (citing *Livezey v. City of Malakoff,* 657 F. App'x 274, 278 (5th Cir. 2016)).

153.    A municipality is liable for a failure to discipline through establishing the existence of deficient investigatory policies that resulted in a failed investigation of an officer's unlawful misconduct. *See Piotrowski v. City of Houston*, 237 F.3d 567, 582 (5th Cir. 2001). Or through establishing that the municipality was deliberately indifferent to its failure to discipline an officer's unlawful misconduct. *See Edwards v. Oliver,* 2019 WL 4603794 at *13 (N.D. Tex. 2019) (citing *Livezey v. City of Malakoff,* 657 F. App'x 274, 278 (5th Cir. 2016)).

**FIRST AMENDED COMPLAINT**

154.     Deliberate indifference in the failure to discipline context is established either through **(i)** a pattern of similar actions by a final policymaker to fail to discipline constitutional violations by employees, or **(ii)** a single incident of a final policymaker failing to discipline extreme constitutional violations. *See Edwards v. Oliver,* 2019 WL 4603794 at *13 (N.D. Tex. 2019) (citing *Connick v. Thompson*, 563 U.S. 51, 62 (2011); *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985)).

155.     Evidence of Defendant City of Lubbock's liability for failures to discipline constitutional violations is inferred from the failure to discipline Defendant Gruner for  similar misconduct eight months prior to Defendant Gruner's killing of Mr. Washington; and then allowing Defendant Gruner to operate as an officer of the AGT.

156.     Further evidence is inferred from the significant deficiencies in Defendant City of Lubbock's shooting review board investigation into Defendant Gruner's unlawful conduct, ratified by Chief Mitchell, and occurred after Defendant Gruner returned to work. The shooting review board's findings utilized false statements, misleading claims, and omitted significant facts to in an unlawful attempt to justify the use of deadly excessive force that killed Mr. Washington; and to refrain from disciplining Defendant Gruner.

157.     Upon information and belief, the initial failure to discipline Defendant Gruner allowed Defendant Gruner to operate in the AGT with impunity towards the public's constitutional rights because Defendant Gruner did not fear discipline for unlawful conduct. Additionally, Defendant City of Lubbock's deficient investigation and failure to discipline Defendant Gruner for his unlawful role in Mr. Washington's death confirmed Defendant Gruner's belief that he could act with impunity, especially in relation to his use of force.

**FIRST AMENDED COMPLAINT**

158.    Similar evidence of Defendant Lubbock County's and Defendant Lubbock County Sheriff's Office's liability for failures to discipline constitutional violations is inferred from their false statements in the "Peace Officer Involved Injuries or Death Report[s]" filed with the Texas Attorney General's Office, as required by TEX. CRIM. P. ART. 2.139.

159.    The report submitted on by Defendant Lubbock County Sheriff's Office, on behalf of Defendant Lubbock County, falsely asserted that Mr. Washington "carried, exhibited, or used a deadly weapon," and did not reveal that the killing of Mr. Washington occurred during operations of the AGT.

160.    Upon information and belief, the report was submitted in order to avoid any discipline for the John Doe Defendants involved in the killing of Mr. Washington, and served to justify the John Doe Defendants' unlawful conduct. Upon information and belief, the John Doe Defendants acted with impunity towards the public's constitutional rights because the John Doe Defendants had knowledge that Defendant Lubbock County Sheriff's Office, on behalf of itself and Defendant Lubbock County, would fail to discipline constitutional violations.

161.    In addition to liability from deficient investigatory policies, the Law Enforcement Entity Defendants' failure to discipline any of the employees responsible for Mr. Washington's death is sufficient to establish the deliberate incident single-incident exception because of the extreme action to fire over twenty bullets at Mr. Washington while he did not present an immediate threat and the blatant violations of Mr. Washington's unconstitutional rights.

162.    As a result, the Law Enforcement Entity Defendants were deliberately indifferent to violations of the Fourth Amendment right to be free from excessive use of force due to their failure to discipline officers involved in the extreme single-incident of Mr. Washington's death.

**FIRST AMENDED COMPLAINT**

163.    The consequence of the Law Enforcement Entity Defendants' failure to discipline employees led to an environment that allowed for law enforcement officers acting under the AGT to willfully and wantonly use excessive without any fear of reprisal, discipline, or wrongdoing.

164.    As a result, the Law Enforcement Entity Defendants' failure to discipline was a causal link to the extreme suffering of Mr. Washington, his death, and the deprivations of his constitutional rights.

165.    Plaintiffs' requests for relief are set forth below.

### AS AND FOR A FIFTH CAUSE OF ACTION FOR A VIOLATION OF
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Wrongful Death)**
**(As to all Defendants)**

166.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

167.    Defendants' previously established violations of Mr. Washington's constitutional rights led to Mr. Washington suffering significant bullet wounds. Defendants' constitutional violations more likely than not led to Mr. Washington instant death from the bullet wounds.

168.    Plaintiffs' requests for relief are set forth below.

### AS AND FOR A SIXTH CAUSE OF ACTION FOR A VIOLATION OF
**TEX. CIV. PRAC. & REM. CODE § 71.004**
**(Wrongful Death)**
**(As to all Defendants)**

169.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

170.    Defendants' previously established violations of Mr. Washington's constitutional rights led to Mr. Washington suffering significant bullet wounds. Defendants' constitutional violations more likely than not led to Mr. Washington instant death from the bullet wounds.

**FIRST AMENDED COMPLAINT**

171.    Plaintiffs' requests for relief are set forth below.

## DEMAND FOR JURY TRIAL

172.    Plaintiffs demand a jury trial on all matters raised in this Complaint.

## PRAYERS FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request judgment against Defendants as follows:

A.  A declaration that the practices complained of herein are unlawful and unconstitutional violations of the Mr. Washington's rights under U.S. Const. Amend. IV and 42 U.S.C. § 1983;

B.  Awarding Plaintiffs their reasonable and necessary attorneys' fees and expenses which Plaintiffs has incurred and will continue to incur during all trial and appellate court proceedings pursuant to 42 U.S.C. § 1983;

C.  That the Court retain jurisdiction over Defendants until such time as it is satisfied that they have remedied the practices complained of and are determined to be in full compliance with the law;

D.  Awarding Plaintiffs such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable;

E.  Awarding Plaintiff B. White, as the representative of the Estate of Mr. Washington, damages for conscious pain and mental anguish prior to Mr. Washington's Death, funeral and burial expenses, and exemplary damages;

F.  Awarding Plaintiff M. White, as wrongful death beneficiary of Mr. Washington, damages for mental anguish, loss of companionship and society, and pecuniary loss.

Plaintiffs also seek injunctive relief, including, but not limited to:

**FIRST AMENDED COMPLAINT**

A.  Training on appropriate use-of-force and de-escalation tactics for all law enforcement officials employed by Defendants; especially in regards to multi-agency operations;

B.  Adoption of use-of-force policies and standards that limit the use of force as a last resort when there is no reasonable alternative, and only when necessary to prevent imminent and serious bodily injury or death,

C.  Adoption of appropriate unified policies and procedures for all multi-agency law enforcement operations conducted by Defendants;

D.  Supervisory discipline up to and including termination for any employee or agent of Defendants who engages in such unlawful arrest and excessive force;

E.  Supervisory discipline up to and including termination for any employee or agent of Defendants involved in the incidents described herein; and

F.  Monitoring by this Court to ensure that compliance by Defendants with all injunctive relief ordered by this Court.

Plaintiffs further demand that they be awarded such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

**FIRST AMENDED COMPLAINT**

Dated: June 22, 2022                    Respectfully submitted,

                                        */s/ David W. Henderson*
                                        David W. Henderson
                                        Texas State Bar No. 24032292
                                        dhenderson@equalrights.law
                                        Jay D. Ellwanger
                                        Texas State Bar No. 24036522
                                        jellwanger@equalrights.law
                                        J. Sebastian Van Coevorden
                                        Texas State Bar No. 24128101
                                        svancoevorden@equalrights.law
                                        **ELLWANGER LAW LLLP**
                                        400 S. Zang Blvd. Ste. 600
                                        Dallas, TX 75208
                                        Telephone: (469) 998-6775
                                        Facsimile:  (469) 998-6775

                                        ***COUNSEL FOR PLAINTIFFS***


### CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2022 a true and correct copy of the foregoing document was served via electronic email to all counsel of record.


                                        */s/ David W. Henderson*
                                        David W. Henderson


**FIRST AMENDED COMPLAINT**